UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT C. CABRAL, SR. | ) | |
| Plaintiff | ) | CIVIL ACTION NO.: |
| | ) | |
| vs. | ) | |
| | ) | |
| MASSACHUSETTS BAY TRANSPORTATION | ) | |
| AUTHORITY, BOSTON CARMEN'S UNION | ) | COMPLAINT |
| LOCAL 589, PATRICK HOGAN, in his official | ) | |
| capacity as Delegate of Local 589 and | ) | |
| JOHN O'BRIEN, in his official capacity as | ) | |
| President of Local 589 | ) | |
| Defendants | ) | |

## I. PARTIES

1.      The plaintiff is, and was, at all times relevant and related to this complaint, a resident of Dorchester, Suffolk County, Massachusetts and a citizen of the United States of America. The plaintiff has a mailing address of 328 Copeland Street, Apt. #2F, Quincy, MA 02169.

2.      The defendant, Massachusetts Bay Transportation Authority ("MBTA"), was (is) the plaintiff's employer at all times relevant and related to this complaint. The MBTA's offices are centrally located at 10 Park Plaza, Boston, MA 02116. The MBTA is a public authority of the Commonwealth of Massachusetts and is mandated by law to serve the public's transportation needs.

3.      The defendant, Boston Carmen's Union, Local 589 ("Union"), is the collective bargaining organization that represents Bus (and other) Operators employed by the MBTA. The Union's offices are centrally located at 295 Devonshire Street, #5, Boston, MA 02110. The Union was (is) the plaintiff's exclusive collective bargaining representative at all times relevant and related to this complaint.

4.      The defendant, Patrick Hogan ("Hogan"), is the Delegate, and representative, of the Union at all times relevant and related to this complaint.

5.      The defendant, John O'Brien ("O'Brien"), is the President, and representative, of the Union at all times relevant and related to this complaint.

## II. JURISDICTION

6.       This Court has jurisdiction over this matter pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 301(a) of the LMRA provides that any federal district court may hear suits based upon the breach of a contract between an employer and a labor organization. In *Smith v. Evening News Ass'n*[1] the Court held that an individual employee may also sue, under Section 301(a), for a breach of the collective bargaining agreement between his employer and his union.

7.       In *Vaca v. Sipes*[2] the Supreme Court considered the question "under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures." The Court found that one situation in which "the employee may seek judicial enforcement of his contractual rights" is where the union has the sole power to invoke the higher stages of the grievance procedure, *and* "the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance." An employee may maintain a § 301 suit under these circumstances, because in enacting the laws imposing a duty of fair representation on unions, Congress did not intend "to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements."[3]

8.       In *Bowen v. United States Postal Service*[4] the Supreme Court referenced its holding in *Vaca*, stating that "a grievance not settled by progressive negotiations between the management and union hierarchies will be taken before a neutral arbitrator, whose decision is final and binding. If either party's wrongful refusal to go to arbitration defeats this [grievance] process, the individual employee may seek redress in the federal courts pursuant to § 301 of the LMRA."

9.       This Court also has jurisdiction over this matter because this complaint further alleges that the plaintiff's rights to privacy,[5] as an employee, were violated by the defendant, MBTA, as the employer,

---

[1] Smith v. Evening News Ass'n, 371 U.S. 195 (1962)
[2] Vaca v. Sipes, 386 U.S. 171 (1967).
[3] Bowen v. United States Postal Service, 459 U.S. 212 (1983).
[4] *Id.*
[5] The right to privacy granted by the Fourth Amendment of the United States Constitution, and further protected by the Omnibus Transportation Employee Testing Act of 1991 (see Public Law 102-143 – October 28, 1991, H.R. 2942, 105 STAT. 917-965).

when it forced post-accident drug and alcohol testing on the plaintiff, without standing, authority or cause, and in violation of the federal regulations it claimed to be administering the testing pursuant to.

### III. INTRODUCTION

10.     This is a "hybrid § 301" case brought under the LMRA. This complaint contains two separate causes of action – the case is brought by the plaintiff against the defendant, MBTA, alleging a breach of [contract] the CBA, and also against the defendant, Union (and its representatives, including defendants, Hogan and O'Brien), alleging a breach of its duty of fair representation.[6]

11.     The plaintiff alleges and affirms that the defendant, MBTA, breached the [contract] CBA in its decision to discipline and discharge his employment, without just cause. The plaintiff also alleges that the discipline (and subsequent discharge) were imposed based on the results of a drug/substance test that the defendant, MBTA, should never have administered. It is the plaintiff's position that the defendant, MBTA, enforced testing (pursuant to federal regulations) for an 'incident' that it incorrectly defined/classified as an 'accident' and in doing so claimed that the plaintiff was subject to 'federally-mandated' post-accident testing. The plaintiff argues that the defendant, MBTA, made an error in its interpretation and application of the 'incident' as an 'accident.' Despite the claims made by the defendant, MBTA, there is irrefutable evidence to support that the 'incident' was not an 'accident,' as defined by the federal regulations, and therefore post-accident testing was not applicable. The plaintiff was disciplined specifically because of the results of the drug/substance test.[7] The plaintiff alleges and affirms that the defendant, MBTA, acted beyond its authority pursuant to the federal regulations mandating post-accident testing and that it invoked testing that it had no authority to enforce. The defendant, MBTA, should have corrected its error prior to a disciplinary hearing, as it was clear that there was no standing to enforce testing in the first place. However, the defendant, MBTA, ignored the facts and imposed/issued (excessive and unjust) discipline solely based on the results of the drug/substance test.

---

[6] In *Bowen*, the Court created a single remedy for which both the employer and the union are liable according to their respective faults. In doing so, the Bowen case implicitly altered Supreme Court precedent by, in effect, viewing the two instances of wrongful conduct (by an employer for wrongful discharge/breach of contract and by a union for breach of duty of fair representation) as a single breach. *See Bowen v. USPS, 459 U.S. 212 (1983).*

[7] Urinalysis drug test results showed a presence of 'marijuana metabolites' in the plaintiff's urine.

12.     The plaintiff responded to the breach (and violations) of the defendant, MBTA, seeking remedy and relief, by filing a grievance. As referenced herein, the defendant, Union, handles and processes all grievances, as it is the exclusive bargaining representative. The plaintiff alleges and affirms that the defendant, Union, acted in an arbitrary and perfunctory manner in the handling of his Grievance and as such breached its duty of fair representation. As a result of the breach by the defendant, Union, the plaintiff was afforded no remedy or relief in its [disciplinary] dispute with the defendant, MBTA. Further, the harm to the plaintiff continued, and grew, when the defendant, Union, *wrongfully* refused to progress the plaintiff's Grievance to the final step, arbitration, thereby leaving the plaintiff with no recourse or option to resolve the matter internally.

13.     All defendants named herein have, so far, faced no consequences as a result of their actions (inactions) and/or conduct, despite the substantial harm its done to the plaintiff. This complaint will establish and prove the breaches alleged, against all defendants named herein, by outlining and reflecting on (1) the underlying events that led to the unwarranted and excessive disciplinary action imposed by the defendant, MBTA, without just cause; (2) the mishandling of the plaintiff's Grievance in an arbitrary and perfunctory manner [and in bad faith] by the defendant, Union; (3) the failure and disregard for compliance with the grievance procedure as set forth in the CBA, by all defendants named herein; (4) the failure of the defendant, Union, in its capacity as "exclusive bargaining agent" and the breach of its duty of fair representation – to wit: the defendant, Union, was unable to obtain a favorable outcome for the plaintiff, at any step of the grievance procedure, which is difficult to understand considering the evidence supporting the plaintiff's claims against the defendant, MBTA; (5) the *wrongful* refusal and denial by the defendant, Union, to pursue arbitration of the plaintiff's Grievance, giving no reason; (6) the overall conduct exhibited by all defendants named herein, at all times; (7) the obligations and responsibilities attributed to all defendants named herein, in their respective roles, that were abandoned and disregarded in this matter; and (8) any and all supporting and relevant facts/evidence that relate to the aforementioned.

## IV. BACKGROUND INFORMATION

14.     The plaintiff became employed, by the defendant, MBTA, as a part-time Bus Operator in July 2015.

15.      The plaintiff was obligated to become a member of the defendant, Union, and was admitted to said Union shortly after his employment began.

16.      The plaintiff worked "split-shifts"[8] for the entirety of his employment and he worked out of the Charlestown Garage/Yard ("Charlestown Garage") located at 21 Arlington Avenue, Charlestown, MA 02129. The buses departing from this garage/yard service the local area.

17.      The plaintiff's "split-shift" schedules rotated quarterly – his hours would [slightly] change along with the [specific] bus routes he'd be assigned. The plaintiff was [always] assigned to work five days a week, Monday to Friday, and worked approximately 30-35 hours per week.

18.      Despite the adjustments to the plaintiff's schedule and routes, the plaintiff was required to arrive at the Charlestown Garage by approximately 6:00am, on Monday, Tuesday, Wednesday, Thursday and Friday. His first shift ran for about 2-3 hours, ending at approximately 9:00am. Then, he'd have a break period, and would return for his second shift by approximately 3:00-4:00pm, which ran for about 3-4 hours, ending at approximately 7:00-8:00pm.

19.      The plaintiff had been assigned to drive multiple bus routes in many areas surrounding the Charlestown Garage (Charlestown, Medford, Malden, Everett, etc.). He was an exceptional employee and represented the defendant, MBTA, professionally and impeccably at all times. He took pride in the responsibilities he had as a Bus Operator and exceeded expectations and obligations in the way he presented himself (and the MBTA) and in his operation of all buses he was assigned to drive. Additionally, he made it a priority to be aware of the passengers he would encounter on a daily (or frequent) basis and they held him to the highest esteem.

20.      The plaintiff was offered and accepted a [consideration of] promotion to full-time Bus Operator on Thursday, October 12, 2017. The aforementioned promotion to full-time offer by the defendant, MBTA, and the acceptance of said offer by the plaintiff is attached hereto as "**Exhibit A**" and

---

[8] A "split-shift" reflects an employee scheduled to work one shift (i.e. morning) for about 2-3 hours, then a break period of several hours, followed by a second shift (i.e. evening) of the day for about 3-4 hours.

is hereby incorporated and made a part of this complaint by reference herein. Also attached as **"Exhibit A"** is the *MBTA memo regarding "Eligibility for Promotion and Transfer."*[9]

21.     On the morning of Thursday, October 19, 2017, one (1) week following the full-time promotion offer and acceptance, the plaintiff called in to the MBTA's Operations Control Center ("OCC"), and requested that he be relieved from his first shift of the day (due to a migraine). The defendant, MBTA, [had no issue with and] granted the request. The plaintiff only asked to be removed from the schedule for his first (morning) shift.

22.     Later that day, the plaintiff arrived at the Charlestown Garage for his second (evening) shift and went to check-in. He was told that when he called earlier that morning, the dispatcher had 'incorrectly' removed him from both of his shifts. Despite that, he was told "well, you're here so just go drive the route." The plaintiff did as he was "ordered" and went to the assigned bus, conducted and completed the appropriate preparation procedures, and departed the Charlestown Garage.

23.     At approximately 6:15pm, as the plaintiff's second (evening) shift was almost completed, an 'incident' occurred on-board his bus. The plaintiff used the brakes to slow and stop the bus, in a usual, expected and normal manner, and a female passenger lost her balance and fell on her arm/wrist/hands. The bus, at the time of the incident, was [almost] at capacity, which is expected during the weekday evening rush-hour commute. There were no other passengers affected, or disturbed, in any way, by the plaintiff's driving and/or use of the brakes.

24.     The plaintiff witnessed the female passenger, who had boarded the bus with a shopping cart (or similar type of cart) and several bags of groceries, distracted and preoccupied on her cell phone (during and prior to the 'incident'). She had been standing near/at the 'do not cross' line/area at the front of the bus since she got on. She was not holding onto anything (other than her cell phone and her bags, with both hands) to secure herself or ensure her own personal safety as a [standing] passenger. A male passenger that was on the bus approached the plaintiff after the 'incident,' and offered to give his contact information as a witness to what happened. The [witness] passenger gave the plaintiff his name and telephone number.

---

[9] The defendant, MBTA, has rules related to an employee's eligibility for promotion. This is important to note because in order for the plaintiff to be offered (and accept) a promotion of any kind, he had to have a clean and clear disciplinary record for an extended period of time, prior to the offer date.

He also provided an informal 'statement.'[10] He confirmed that the plaintiff's driving, and his use of the brakes, had not caused, or contributed, in any way, to the 'incident.' The [witness] passenger stated that the female passenger was distracted on her cell phone, and that she fell because she was not paying attention or holding on. Following the 'incident,' the plaintiff safely pulled the bus over and parked so he could contact dispatch (OCC). He reported the 'incident' and waited for instructions on how to proceed.

25.     In response to the report to dispatch, an Inspector (employed by the defendant, MBTA) was sent to the scene. An ambulance was also dispatched to the scene, which is a standard precaution taken regardless of whether an actual injury has occurred or is claimed. After the Inspector arrived, the plaintiff relayed what happened. The female passenger immediately made (or received) a phone call after she fell down, and before the plaintiff had reported the 'incident' to dispatch or pulled the bus over.[11]

26.     The EMT that arrived on scene [with the ambulance] assessed the female passenger's hand/wrist/arm. She determined that there was no further medical attention needed or required. In response to that determination, the female passenger insisted (directed by the person she was on the phone with) that she still be taken to the hospital in the ambulance. The EMT reiterated that she required no additional medical attention, and that there was no reason for her to go to the hospital, but the female passenger refused to accept that assessment, and 'demanded' she be taken to the hospital.[12]

27.     The plaintiff was forced to terminate his shift, and the bus was taken out of service, at the direction of the Inspector. The passengers had to exit the bus and wait for the next one to come. Due to the fact that the passengers had been delayed and inconvenienced enough already by the 'incident,' and the

---

[10] The defendants, MBTA, Union, Hogan and O'Brien, were all aware of this witness but it is unclear whether or not the witness was called upon to confirm, officially, at any time, that the plaintiff had not contributed or caused the 'incident' and the fault was solely on that of the female passenger.

[11] The female passenger remained on the phone (with the same person) immediately after falling down until the plaintiff departed the scene. She seemed to have no trouble holding her phone, pushing her shopping cart and carrying her groceries after she fell. She displayed no actual signs of "bodily injury" and made several remarks [to the person she was on the phone with] regarding the plaintiff. The plaintiff observed the female passenger clearly being instructed on how to proceed, and being told what to say and do, by the person she was on the phone with in regards to the 'incident.'

[12] The female passenger was informed that she required no further medical attention, and that it was unnecessary to transport her to a hospital (emergency room). The fact that the female passenger demanded, and insisted, that the EMT transport her to a hospital does not automatically invoke 'federally-mandated' post-accident drug and alcohol testing. There are specific criteria that must be met in order for an 'incident' to be defined as an 'accident,' and only if, and when, there is a clear 'accident' can an employer demand 'federally-mandated' post-accident drug and alcohol testing of an employee.

subsequent events that followed, the plaintiff didn't want to add onto that inconvenience by asking for any more of their time and patience – he already had one witness and he didn't think he'd need multiple considering what had happened.[13]

28.       The plaintiff was ordered to accompany the Inspector to 'headquarters' (of defendant, MBTA), located at 10 Park Plaza, Boston, MA 02116 ("MBTA Headquarters"). The Inspector stated that upon arriving at MBTA Headquarters, the plaintiff was required to give oral and written reports of the incident as well as submit to 'post-accident' drug and alcohol testing. The plaintiff was hesitant and skeptical about his actual obligations regarding post-accident testing. He wanted to ask questions, and find out why any further action on his part was being forced. But he feared that if he disobeyed, or even displayed signs of reluctance, he'd be charged with insubordination.[14] He felt complying with the Inspector's orders was the only viable option he had. In retrospect, if given the chance, he would have refused to submit to the testing, based on the fact that the defendant, MBTA, had no authority to impose testing of any kind and he, as an employee, had (has) a right to privacy and fair treatment, under the federal regulations [specifically the Omnibus Transportation Employee Testing Act of 1991].[15] If the plaintiff was aware of his rights at the time, he would have sought the advice and support of a union representative before he submitted to any testing.

29.       As mentioned herein, even though the plaintiff was concerned with whether or not he was obligated, or required, to be tested for drugs and alcohol, he followed the Inspector's orders, because he was afraid and didn't want to jeopardize his job. The plaintiff reasonably believed that if the defendant, MBTA, lacked the authority to actually administer, or force, post-accident testing against him, then the tests and any results could not be used against him, and would be disregarded and disposed of, without recourse.

[13] The plaintiff didn't anticipate that there would be such severe and punitive action taken against him, or that he'd need multiple witnesses' statements and accounts to corroborate or defend himself and/or secure his position.
[14] The plaintiff, at the time, believed that the consequences for insubordination would result in much more severe and significant consequences. The plaintiff feared termination, and felt that if he disobeyed a direct order, he'd be faced with potential discharge disciplinary action. The plaintiff never expected that following the directions of the Inspector would actually produce the worst possible result. The plaintiff had never been in such a situation, and as such, was not privy to what his rights were or that he was only obligated to submit to 'federally-mandated' post-accident testing under specific circumstances, which were not applicable to the 'incident,' and he felt that he had no options other than to comply with the Inspector's demands and instructions.
[15] The Omnibus Transportation Employee Testing Act of 1991 protects: "an individual's right to privacy and ensures that no individual is harassed by being treated differently from other individuals, and ensures that no individual's reputation or career development is unduly threatened or harmed."

The plaintiff was also told he could not go home until he completed the oral and written reports and submitted to the drug and alcohol tests. There were undue restraints, whether implied or expressed, that resulted in the plaintiff feeling as though his professional life (and by default, his personal life) would be irreparably harmed if he did not follow the orders he was given. He reasonably believed that he had no choice but to comply, and he had no advisory to look to for the appropriate guidance.

30.     The plaintiff's alcohol screening was negative. The test was conducted and completed quickly and the plaintiff was given a copy to confirm those results at MBTA Headquarters that night. In comparison, the drug screening/testing required several days to complete.

31.     The plaintiff was kept at MBTA Headquarters for several hours, and was subjected to intense, severe and unnecessary scrutiny. In addition, the plaintiff was transported by the Inspector, for a second time that evening, from MBTA Headquarters to the Charlestown Garage, where he had to submit additional written reports of the incident. Finally, after 11:00pm, the plaintiff was allowed to go home from the Charlestown Garage. The plaintiff was, in essence, forcibly "detained" by the defendant, MBTA for over five (5) hours; he was treated as though he had committed an incomprehensible act, or as though he had an extensive history of disciplinary actions that would warrant such an extreme reaction. He was 'intimidated' and 'coerced' into complying with orders to be drug and alcohol tested. There is no reasonable person that would agree with, or find it necessary to implement, the practices used by the defendant, MBTA, in response to the 'incident' and the plaintiff. The plaintiff was subjected to treatment that is not standard – the way that the defendant, MBTA, handled the 'incident' is not how it operates regularly. **The plaintiff asks that the defendant, MBTA, provide evidence to affirm that it didn't deviate from its standard practice, and show that it has, and does, treat every single employee involved in the same (or similar) situations, the way it treated the plaintiff.**

32.     The plaintiff was told, before he was allowed to leave that night, that he couldn't "return to duty" until the drug test results were completed and an investigation was conducted and completed. The

plaintiff received the drug test results on October 25, 2017 and was also informed that a disciplinary "interview" and "hearing" was scheduled to take place on that same day.[16]

33.     The disciplinary hearing was held by an unknown woman, who issued and imposed the disciplinary action onto the plaintiff.[17] The hearing normally would have been conducted by the plaintiff's usual Supervisor, Carlos Osgood ("Carlos"). However, Carlos was on an extended leave and as such, was not involved with the investigation into the incident or in the determination to (excessively) discipline the plaintiff. Discipline is [usually] determined by a supervising officer that personally knows the employee. However, that approach was not exercised in the plaintiff's case and the result was disproportionate and excessive disciplinary actions, issued and imposed by an unknown woman,[18] which would may not have been imposed or issued had Carlos been available or at all involved in determining the plaintiff's discipline.

34.     The discipline was issued because the drug test results showed a presence of "marijuana metabolites" in the plaintiff's urine. The test was marked POSITIVE and the plaintiff had failed. Prior to this test, the plaintiff had been required to submit to multiple drug tests over the course of his two (2) plus years of employment, and this was the first, and only, time the plaintiff failed a drug test. The failed test was due to an accidental, innocent and unintentional intake of marijuana by the plaintiff. The plaintiff had an explanation for the presence of "marijuana metabolites" in his urine – and tried to explain that he was not complicit in the ingestion and that he was sincerely upset about what had happened [to no avail].[19]

---

[16] The investigation presumably began on Friday, October 20, 2017, which was the day after the 'incident.' The investigation presumably was completed on Tuesday, October 24, 2017, the day before the disciplinary hearing took place. The plaintiff assumes that the investigation was conducted on weekdays only, which reflects a three (3) day investigation period before a disciplinary hearing was scheduled. The plaintiff is unable to confirm the "presumed" and "assumed" information aforementioned, because all of the defendants named herein have continuously ignored multiple (and separate) requests made for documentation and records relating to this matter.

[17] The unknown woman was a 'stand-in' for the plaintiff's supervisor, Carlos Osgood. The plaintiff was disciplined by an individual that he had no prior personal, or professional, relationship with.

[18] The plaintiff does not know the identity of the supervisor/superior that issued and imposed the disciplinary action on him. The signature of the supervisor/superior that issued and imposed the discipline is illegible (see Exhibit B). The signatory's name was not included (hand-written in, or typed) or provided on the applicable documentation to specify, and clarify, who conducted the hearing, determined the discipline and authorized and confirmed the disciplinary action.

[19] The plaintiff called out and did not work his first (morning) shift on the day of the incident due to a headache/migraine and because he was not feeling well. There was a specific reason for those aforementioned symptoms: the plaintiff was significantly upset about something that happened the night before. The plaintiff had unknowingly eaten a brownie that had marijuana baked into it. The plaintiff had no prior knowledge of the brownie's contents, and was completely unaware of the marijuana. The details, and overall explanation, aren't important for the purposes of this complaint, but it should be noted that the presence of marijuana in the plaintiff's urine was not the result of intentional, or recreational, use. The presence of marijuana in the plaintiff's urine was in no way due to a voluntary act. It was an innocent, and accidental, mistake. The plaintiff tried to explain why he had failed the drug test

35.     As a direct result of the failed drug test, the plaintiff was disciplined at the most severe level – the discipline was, among many things, meant to be punitive.[20] The plaintiff was informed, at the hearing, that his discipline would consist of a 70-day (unpaid) suspension and a recommendation for discharge. The discipline was unwarranted, excessive and had no legitimate basis. It was issued without any consideration made to the [applicable] mitigating circumstances, which included but are not limited to: (1) the unknown woman skipped every discipline track on both the general track and safety track of the MBTA's Progressive Discipline Policy; (2) the plaintiff had just been offered a promotion, less than two (2) weeks prior to the hearing and disciplinary action; (3) the plaintiff's "clean" employee record was completely disregarded; and (4) the failed drug test was a first "offense" and there was no reason, or history, to suggest that the explanation provided by the plaintiff wasn't truthful and accurate, or that the plaintiff, as a Bus Operator, was considered a risk to public safety. The plaintiff was scrutinized at an obscene level, and was subjected to an unjustifiable disciplinary standard. It is difficult to understand how, and why, it was even allowed at the disciplinary hearing, and how it could have possibly survived the grievance process to affirm and support the eventual discharge of the plaintiff.

36.     As noted, the disciplinary hearing took place on Wednesday, October 25, 2017. Copies of the "interview slip" and "discipline slip" that the plaintiff received at the hearing are attached hereto as **"Exhibit B"** and are hereby incorporated and made a part of this complaint by reference herein. Also attached as part of **"Exhibit B"** is the *Grievance [letter/report]* filed by the plaintiff with the defendant, Union, on November 7, 2017.

37.     For purposes of this complaint, it's claims, arguments and contents, copies of the (1) *MBTA's Progressive Discipline Policy;* (2) *MBTA's Revenue Vehicle Policy – Bus & Light Rail Division;*[21]

---

during the "interview" of the disciplinary hearing to no avail. Additionally, a detailed explanation was provided in the plaintiff's Grievance.

[20] The MBTA's Progressive Discipline Policy specifically states that discipline should never be punitive.

[21] The MBTA's Revenue Vehicle Policy – Bus & Light Rail Division provides the definition of an accident, and further elaborates on the 'accident types' in which an 'incident' and/or 'accident' can be classified. The 'accident types' include: (1) Preventable; (2) Non-Preventable; (3) Re-Instructable Occurrence; (4) Defective Equipment; and (5) No-Accident. This Policy specifically states "if the incident being investigated does not meet the definition of an accident, the Instructor will return the information to the Superintendent of Bus/Subway Training and indicate that the event constituted a 'no accident.' When a 'no-accident' determination is made, the Superintendent of Bus/Subway Training will inform the Safety Department and the District Transportation Superintendent. **No corrective action will be taken with respect to an employee determined to be involved in a 'no accident.'"**

*and* (3) *MBTA's Drug & Alcohol Policy, effective as of February 2014*, are attached hereto as **"Exhibit C"** and are hereby incorporated and made a part of this complaint by reference herein.

38.     After the disciplinary action had been issued, the plaintiff immediately prepared a detailed and thorough Grievance (see **"Exhibit B"** for copy of Grievance, as referenced and mentioned previously) and submitted it to Joseph Cerbone ("Cerbone"), the Secretary of the defendant, Union, on November 7, 2017.[22]

39.     The plaintiff received confirmation, informally, within a week after submitting it, from Cerbone, that his Grievance had been reviewed and submitted to the defendant, MBTA.[23] Anything related to specific dates and his Grievance going forward are all approximations and estimates.[24]

40.     Sometime in December 2017, the defendant, Union, assigned the plaintiff's Grievance to the defendant, Hogan. The plaintiff was told that Cerbone was no longer 'involved' and to contact the defendant, Hogan, regarding his Grievance. Based on the limited, unofficial and informal information available to the plaintiff, and to reiterate and expand on previously stated points, the plaintiff can confirm that Cerbone received and submitted his Grievance to the defendant, MBTA (*actual submission to the MBTA having occurred sometime after November 7, 2017 but sometime before the 30-day deadline to file after the disciplinary action is issued*). But, after that, any and all actions (inactions) taken with respect to the plaintiff's Grievance, were assigned to, and the responsibility of, the defendant, Hogan, and the plaintiff is unaware of the specific dates in which decisions were made with respect to his Grievance.

41.     In December 2017, the plaintiff contacted the defendant, Hogan, and the two had a brief, but positive, telephone conversation. The plaintiff asked the defendant, Hogan, to explain the grievance process, so that he knew what to expect and how to prepare. The defendant, Hogan, quickly outlined all of the steps in the grievance procedure, but spent the majority of time on the arbitration phase. The plaintiff,

---

[22] As is required by the terms and conditions of the CBA, grievances must be submitted to the defendant, Union, as it is the exclusive bargaining representative of all union members. All grievances are to be processed by and through the defendant, Union. After receipt of a grievance, the defendant, Union, reviews and submits the grievance to the defendant, MBTA, and proceeds accordingly, acting on behalf of the employee Grievant.

[23] The plaintiff was never informed of the exact date in which his Grievance was submitted to the MBTA. The only confirmed date that the plaintiff has knowledge of is the date that he, personally, submitted his Grievance to Cerbone.

[24] The plaintiff has had all of his requests ignored by all of the defendants named herein for the production of any and all relevant documentation and records pertaining to his Grievance and the disciplinary action. This is why the plaintiff is unable to definitively confirm most, if not all, dates related to the grievance process.

although appreciative of the confidence and positivity exhibited by the defendant, Hogan, in his expectations to secure reinstatement and retroactive back-pay by and through arbitration, wanted to discuss the earlier steps of the process because he believed the defendant, MBTA, should be willing to allow/accept his Grievance before the need for arbitration arrived.[25] There was clear and convincing evidence that supported and validated the plaintiff's Grievance and there were substantial issues and conflicts in regards to the way the defendant, MBTA, disciplined the plaintiff. Nonetheless, the conversation left the plaintiff feeling as though, at the least, the end result would be positive, even if it took longer than he expected and required arbitration to fully resolve.

42.     After the telephone conversation in December 2017, the communication between the plaintiff and the defendant, Hogan, was essentially non-existent. The plaintiff made numerous attempts to communicate with the defendant, Hogan, but wasn't given much, if any, attention or assistance.

43.     The plaintiff was never notified of when specific steps of the grievance process were taking place. To this day, he has no idea when any of the actual grievance steps took place, nor does he know (1) what was discussed at each step; (2) who decided to deny his Grievance at each step; (3) why his Grievance was denied each time; and (4) what efforts were extended by the defendants, Union and Hogan, on his behalf. The plaintiff was not allowed to attend any of the hearings, meetings, etc. during the grievance process and he was excluded from participating [at all] in his case. The defendant, Hogan, would inform the plaintiff, with no real details or actual context, and only after the plaintiff would make contact to find out the status, that his Grievance had been denied at each step.[26]

44.     On March 25, 2018, the plaintiff received a letter from Luis M. Ramirez, General Manager and CEO of the MBTA ("GM").[27] The letter, dated March 12, 2018, was delivered by first-class mail only

---

[25] The grievance procedure is meant to resolve disputes before the need for arbitration arrives. In *Vaca v. Sipes, 386 U.S. 171 (1967)*, the Court observed that when a union and employer establish a grievance procedure, they expect to resolve most grievances prior to arbitration. Through negotiation, in the earlier steps of the grievance procedure, the parties hope to weed out frivolous claims, treat similar complaints consistently and isolate and try to resolve major problems of contract interpretation.

[26] The plaintiff was never notified, by the defendant, MBTA, in writing, of the decisions made at each step of the grievance process. It is required by the CBA, that the defendant, MBTA, must inform/notify the employee Grievant, directly, in writing, of any and all decisions that are made at each of the steps of the grievance procedure.

[27] The letter from the GM was the first, and only, letter/notice that the defendant, MBTA, sent to the plaintiff. The last communication from the defendant, MBTA, to the plaintiff was handed to the plaintiff at the disciplinary hearing on October 25, 2017.

(despite the letter referencing delivery via certified mail). The GM informed the plaintiff that effective as of that date (March 12, 2018), the MBTA had discharged him as a Bus Operator.[28] The letter didn't mention his Grievance, or reference whether it was being sent in connection to it. A copy of the letter is attached hereto as **"Exhibit D"** and is hereby incorporated and made a part of this complaint by reference herein.

45.      The defendant, Hogan, sent an e-mail to the plaintiff, dated March 2, 2018, but not delivered/received until after the plaintiff's receipt of the discharge letter, that stated: "Grievance denied at GM." The plaintiff, in response to the discharge letter (and aforementioned e-mail) sent an e-mail to the defendant, Hogan, on March 27, 2018, asking him what the next steps were to ensure the request for arbitration was timely and properly made. The plaintiff had to send several e-mails and faxes, as well as make many phone calls, to the defendant, Hogan, in order to obtain a response. It took about three (3) weeks before the plaintiff was able to speak with the defendant, Hogan, on the telephone on April 17, 2018. The telephone conversation was confrontational and extremely unsettling to the plaintiff. The defendant, Hogan, told the plaintiff "your grievance is no longer being given any attention and will remain that way until you pay any outstanding dues you owe." The plaintiff was additionally told "and even if you pay your dues, there is a 99.9% chance that your request for arbitration is being denied." The plaintiff was unsure of where the shift in the defendant, Hogan, had come from, given that all prior conversations indicated a positive resolution of his Grievance and overall support. It had been the plaintiff's understanding, pursuant to what he'd been told by [Cerbone and] the defendant, Hogan, that any unpaid dues would (could) be paid retroactively upon reinstatement. The plaintiff had been suspended, and had no income, for a total of 174 days (5 months, 23 days) at the time of the telephone conversation on April 17, 2018. The plaintiff and his family (his 9-year-old son and his son's mother) had been struggling financially, as well as physically, emotionally and mentally, since the disciplinary action was issued. **The defendant, Hogan, [and Cerbone,] both also advised the plaintiff not to apply for unemployment benefits because "it will affect the backpay when you're reinstated."** Copies of the correspondence sent by the plaintiff, to the

---

[28] The letter gave a list of "reasons" why the plaintiff had been discharged. The list was inconsistent, and somewhat inaccurate. The list slightly differed from the "violations" and "offenses" that were on the 'disciplinary slip' and 'interview slip' from October 25, 2017. The list also stated that the plaintiff's "prior record" supported the discharge, which conflicts with the plaintiff's ability to be offered a promotion to full-time.

defendant, Hogan, between March 27, 2018 and April 17, 2018 are attached hereto as **"Exhibit E"** and are hereby incorporated and made a part of this complaint by reference herein.

46.     After the plaintiff spoke with the defendant, Hogan, on April 17, 2018, he felt he needed to contact the defendant, O'Brien (President of the defendant, Union) and Peggy LaPaglia ("LaPaglia") (Vice President of the defendant, Union). The plaintiff relayed the issues faced with the defendant, Hogan, and asked for any help. He asked defendant, O'Brien, and LaPaglia, for assistance with his Grievance and information on what he had to do to proceed, as planned, to the arbitration phase. Several attempts to communicate with the defendant, O'Brien, and LaPaglia were all unsuccessful. Copies of all correspondence sent to O'Brien and LaPaglia in April 2018 are attached hereto as **"Exhibit F"** and are hereby incorporated and made a part of this complaint by reference herein.

47.     The plaintiff, having received no response from the defendants, Hogan, O'Brien and Union, or LaPaglia, prepared and sent an extensive and detailed letter to the GM of the MBTA on April 29, 2018.[29] A copy of the letter (and the 'green cards' confirming receipt by the GM and the defendant, O'Brien) is attached hereto as **"Exhibit G"** and is hereby incorporated and made a part of this complaint by reference herein.

48.     The plaintiff continued his attempts to communicate with, and receive assistance of any kind, from the defendants, Union, Hogan and O'Brien, and LaPaglia. Over the first couple of weeks in May 2018, he made several telephone calls, and sent a fax, all of which were ignored by all of the aforementioned parties. Copies of this correspondence from the plaintiff, during the aforementioned time, are attached hereto as **"Exhibit H"** and are hereby incorporated and made a part of this complaint by reference herein.

---

[29] A copy of the letter [to the GM] was sent to the defendant, O'Brien, as well. The letter explained the plaintiff's situation and also noted the promotion offered and accepted on October 12, 2017. The letter further discussed the 'incident' on October 19, 2017, the disciplinary action imposed on October 25, 2017, and the ensuing grievance process that had, by that point, spanned over 5-months and had not been resolved. The letter also made note of the recent (and overall) unsuccessful attempts to be assisted by the defendants, Union, Hogan and O'Brien, in the grievance process. The letter asked the defendant, MBTA, and its GM, to reconsider its decision to discharge the plaintiff's employment and requested that the case be revisited and reviewed, taking into consideration all of the information provided therein by the plaintiff. The letter additionally, and formally, requested that the defendant, MBTA, produce and forward to the plaintiff any and all records and documentation pertaining to and/or associated with the 'incident,' investigation, disciplinary hearing and action, and grievance procedure. As of this date, the plaintiff has not received a response nor has the defendant, MBTA, forwarded/produced any of the requested documentation or records.

49.      On May 15, 2018, the plaintiff received a certified letter from the Executive Board ("Board") of the defendant, Union. The letter, dated May 3, 2018, stated that the Board had decided "not to pursue arbitration of your discharge grievance."[30] <u>The letter did not give a reason as to why the Board denied arbitration.</u>[31] The letter informed the plaintiff of his right to appeal the Board's decision by asking his fellow union members to vote to bring his case to arbitration at the next Membership Meeting ("Meeting") on May 15, 2018. The plaintiff, having received the letter in the afternoon on the same day in which the Meeting was scheduled, had no advance notice, of even 24 hours, and as such was not able to prepare for or attend the Meeting. A copy of the Board's letter is attached hereto as "**Exhibit I**" and is hereby incorporated and made a part of this complaint by reference herein.

50.      On May 16, 2018, the plaintiff attempted to communicate with the defendant, Hogan, to find out how to appeal the Board's decision at the Meeting that would take place in June 2018. Several attempts to communicate were made between May 16, 2018 and mid-June 2018, by the plaintiff to the defendants, Union, Hogan and O'Brien, and LaPaglia, all of which were ignored. Copies of the aforementioned correspondence sent by the plaintiff are attached hereto as "**Exhibit J**" and are hereby incorporated and made a part of this complaint by reference herein.

51.      The plaintiff continuously visited the website of the defendant, Union (www.carmensunion589.org), in May and June 2018, to find out the scheduled Meeting date for June 2018. The website calendar remained empty and the Meeting was only added to the calendar after it had already taken place. Copies of the calendars and the "meeting details" from www.carmensunion589.org are

---

[30] The plaintiff attempted to communicate with any union representative throughout the first two-weeks of May 2018 to try and understand what was happening with his Grievance [and arbitration]. All attempts were unsuccessful. As is discussed herein, there was an important, and time-sensitive, decision made by the Board on May 3, 2018 – and despite that, the defendant, Union (and its representatives), made no effort to reply/respond/answer the plaintiff during the beginning of May. It was clear that the plaintiff was not aware of the Board's decision (in his attempts to communicate, he never referenced/mentioned the Board's decision). If someone answered/responded to the plaintiff during the first two-weeks of May, and advised him of the Board's decision [by e-mail, fax, telephone] it would have given him notice and he would have been able to exercise his appeal right at the Meeting. There is no excuse for ignoring the plaintiff, especially when there was a chance to relay critical and important information in a timely manner.

[31] "However, we are still left with the Court's recognition that arbitrary and perfunctory handling by a union of an apparently meritorious grievance is not acceptable under the standard of fair representation" *De Arroyo v. Sindicato De Trabajadores Packing, AFL-CIO, 425 F. 2d. 281 (1970) U.S. Appeals Court, 1st Circuit.*

attached hereto as "**Exhibit K**" and are hereby incorporated and made a part of this complaint by reference herein.[32]

52.      In response to being ignored by the defendants, Union, Hogan and O'Brien, and LaPaglia, between the mid-end of June and this current date, the plaintiff conducted his own research to establish the options he had to address the disciplinary action and discharge, and to determine what the next steps were to proceed. The plaintiff sought the assistance of the National Labor Relations Board ("NLRB") in September 2018 by filing a "Charge against Labor Organization or its Agents" against the defendants, Union and its representatives, specifically noting that Hogan was the individual representative assigned to his Grievance. However, the NLRB informed the plaintiff, informally by telephone, that pursuant to the Railway Labor Act ("RLA"), the NLRB didn't have jurisdiction over matters that involved "railway industry" employers, and even though the plaintiff's Charge was directed against the defendant, Union, and not the defendant, MBTA, "it had to be processed by and through the National Mediation Board ("NMB")." The plaintiff researched the NMB, and discovered the National Railroad Adjustment Board ("NRAB"). The plaintiff researched and confirmed that the NLRB did not have jurisdiction, and that it was the NMB and NRAB that handled disputes, major and minor, respectively, and that those two (2) agencies had jurisdiction over matters involving "railway industry" employees and carriers. As he continued researching, it became clear that both the NMB and the NRAB didn't accept complaints, charges, etc. against labor organizations. It became clear that the plaintiff couldn't pursue his charge against the defendant, Union, with the NMB or NRAB – the NLRB offered an option/avenue that was not extended to employees in the "railway industry." It is unclear whether or not the NRAB would accept any filings from an individual employee against an employer, because it seems as though an employee's disputes must be filed, and represented, by a Union.[33]

---

[32] Copies are dated November 2, 2018, to reflect the current calendars and details/events.

[33] In October 2018, the plaintiff prepared and sent a letter (via e-mail and certified mail, return receipt requested) requesting information, and instructions on how to present a dispute against the defendant, MBTA, to the NMB and/or NRAB. The letter was sent to both offices of the NMB and NRAB. As of November 14, 2018, the plaintiff has not received a response from the NRAB. The NMB responded, via e-mail, and a copy of that e-mail is attached hereto as "**Exhibit L**" and is hereby incorporated and made a part of this complaint by reference herein. Also, part of "**Exhibit L**" is the e-mail and letter (with enclosures) sent to the NMB and NRAB – it should be noted that the enclosures consisted of the "Charge" sent to the NLRB in September 2018. In the e-mail response [from the NMB], the NMB claimed it had no interest in hearing the plaintiff's situation and suggested that the plaintiff seek an attorney and take the dispute to the "Courts."

53.     Prior to the plaintiff's receipt of the discharge notice from the GM (March 25, 2018), the Grievance filed in November 2017 was reflective of the "disciplinary action" (suspension and 'recommendation for discharge') imposed on October 25, 2017. Although the plaintiff addressed, in his Grievance, the "recommendation for discharge" that was noted on the October 25, 2017 disciplinary action, the actual discharge had not occurred until March 12, 2018. The main issue, and discipline, in dispute in the plaintiff's Grievance was the suspension, since a discharge decision had not yet been reached. The defendant, Union, never differentiated between the two (2) separate disciplinary actions (i.e. the 70-day unpaid suspension and then the discharge) and denied arbitration of the plaintiff's "discharge grievance" on May 3, 2018. The plaintiff had never been afforded an opportunity to dispute, or file a grievance, with respect to the discharge that took effect March 12, 2018. The defendant, Union, denied the plaintiff the ability to initiate a "discharge grievance" and did so knowing that the plaintiff had the right to file a new grievance to specifically address the discharge. In effect, the defendant, Union, continued as though the Grievance filed in November 2017 extended to the plaintiff's discharge/termination that was not imposed until March 2018.

### V. CAUSE OF ACTION

54.     The plaintiff hereby re-alleges and re-affirms Paragraphs 1-53, and incorporates them into this cause of action.

55.     The LMRA states that its purpose is: "to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce…"

56.     Given the circumstances that surround this matter, related to all defendants named herein, the plaintiff has faced a clear disadvantage and has been (is) limited [and restricted] in his ability to ensure that his rights as an employee were (are) upheld and respected. The decisions and actions (inactions) made – from the excessive and unwarranted disciplinary action to the mishandling in the grievance procedure as well as the *wrongful* refusal and denial of arbitration – all reflect an infringement on the rights of the

employee-plaintiff. Due to the actions of the defendant, MBTA, and the inactions of the defendants, Union, Hogan and O'Brien, the plaintiff has been undoubtably harmed, financially, emotionally, mentally and physically, for over a year. The plaintiff was scrutinized at an obscene and unwarranted level, without cause, by the defendant, MBTA, and he received little, to no, assistance from the defendant, Union, which is the organization established to ensure its union member employees are not mistreated, or taken advantage of, by their employer.

57.     In *Bowen v. United States Postal Service,*[34] the majority and minority, agreed that the grievance procedure seeks to protect the following interests: (1) the employer's interest in limiting administrative remedies and liability; (2) the union's interest in implementing the collective bargaining agreement and limiting liability; and (3) the employee's interest in vindicating his claim and being made whole.[35] Eight of the nine Justices[36] in *Bowen* agreed that the employee's interest in being made whole is of paramount importance.[37]

58.     It has been established, in case law and in theory, that the grievance procedure is premised on the supposition that "both the employer and the union will fulfill their respective obligations." If they do not, each party should be liable for that portion of the damages arising from its wrongful conduct."[38]

### COUNT 1: BREACH OF CONTRACT, VIOLATION OF PRIVACY AND WRONGFUL DISCHARGE FROM THE MBTA

59.     The plaintiff alleges and affirms, with supporting evidence and facts, that the defendant, MBTA, breached [the CBA] its contract with the plaintiff when it imposed excessive and unwarranted discipline[39] in violation of the Collective Bargaining Agreement ("CBA"), the MBTA's Progressive Discipline Policy and the MBTA's Revenue Vehicle Accident Policy – Bus & Light Rail Division.

---

[34] Bowen v. United States Postal Services, 459 U.S. 212 (1983).
[35] Bowen v. United States Postal Services, 459 U.S. 212 (1983) – compare at 221-222 with *id.* at 236 (White, J., dissenting and concurring in part).
[36] The arguable exception being that of Justice Rehnquist, see *id.* at 246-247 (Rehnquist, J., dissenting).
[37] *Id.* at 222 and *id.* at 245 (White, J., dissenting and concurring in part).
[38] *Id.* at 227.
[39] The plaintiff was subjected to an immediately effective 70-day (unpaid) suspension and a recommendation for discharge at a disciplinary hearing held on October 25, 2017. It should be noted that, despite the 70-day period imposed, the plaintiff was actually suspended for a period greater than 70-days. Although unclear, the plaintiff is willing to concede to the fact that the 70-day suspension applied only to week-days and excluded week-ends and Holidays. That being said, the 70-day suspension period expired on January 31, 2018. However, the plaintiff was never offered, or extended, any opportunity to return to duty, or even notified, at all, by the defendant, MBTA, with respect to the suspension expiration. The plaintiff remained suspended for almost two (2) months after the suspension

60.     The plaintiff alleges and affirms that the disciplinary action and discharge issued and affirmed by the defendant, MBTA, was done without just cause, which in itself violates the CBA and MBTA's Progressive Discipline Policy.

61.     The plaintiff alleges and affirms that his rights to privacy[40] were violated by the defendant, MBTA, when it forced him to submit to drug and alcohol testing, without having any authority to do so. The plaintiff complied with and submitted to the drug and alcohol testing demanded because he feared he'd be charged with insubordination otherwise. The plaintiff was given no union representation, or the option to confer with a union representative, to discuss the situation and determine if he was being forced to comply to testing without cause.

    1.     The Omnibus Transportation Employee Testing Act of 1991 ("Omnibus Act")[41] states the following: "adequate safeguards [can] be implemented to ensure that testing for abuse of alcohol or use of illegal drugs is performed in a manner which protects an **individual's right of privacy**, ensures that no individual is harassed by being treated differently from other individuals, and ensures that no individual's reputation or career development is unduly threatened or harmed."[42]

---

period expired, until he was notified that his employment had been discharged (via letter from GM of MBTA received March 25, 2018) effective March 12, 2018.

[40] The Fourth Amendment to the United States Constitution guarantees against unreasonable search and seizure – "the right of the people to be secure......against unreasonable searches and seizures, shall not be violated." Case law has established that a mandatory blood, urine or breath test constitutes a search under the Fourth Amendment. *Skinner v. Railway Labor Executive Association, 489 U.S. 602 (1989)*. The focus however, in terms of violations of the Fourth Amendment, is on whether the test [search] is unreasonable. Post-accident drug and alcohol testing is necessary for safety-sensitive [mass transportation] employees as they are responsible for the safety and well-being of the public at large. However, there are limits, and criteria that must be met, to ensure that an employee is not simply subjected to 'unreasonable' testing under the guise of 'protecting the public.' The courts have held that certain employees, such as those operating mass transportation vehicles, have less rights to privacy in this respect, given the public-safety aspect of their positions. But there are still basic standards and regulations in place that are [in effect] meant to protect [employee] privacy rights. There are specific federal regulations in place that outline when an employee is 'mandated' to submit to post-accident testing. It is not acceptable, or constitutional, for an employer to force [post-accident] federally-mandated testing on an employee unless an 'accident' (as defined) has truly occurred – and it must comply with the criteria and circumstances set forth in the regulations. **It is unconstitutional for an employer to invoke authority, pursuant to the federal regulations, and force an employee to submit to testing, unless the employer has evidence to confirm that an 'accident' has occurred and that the situation explicitly allows such action and is being administered in accordance with the [federal] regulations.**

[41] Public Law 102-143, H.R. 2942 – October 28, 1991 (102d Congress). Title V-Omnibus Transportation Employee Testing.

[42] *Id.* at 105 Stat. 953, Title V. Section 2(6).

2.      The plaintiff's privacy was violated when the defendant, MBTA, administered 'federally-mandated' post-accident drug and alcohol tests for an 'incident' that was not applicable or enforceable. There is no evidence to support the determination made by the defendant, MBTA, that the 'incident' was an 'accident' subject to the 'federally-mandated' post-accident testing regulations.

62.      The plaintiff alleges and affirms that the defendant, MBTA, overstepped its authority by improperly enforcing and implementing Federal Transportation Authority ("FTA") and Department of Transportation ("DOT") post-accident regulations, after it erroneously classified an 'incident' as an 'accident.'[43] The defendant, MBTA, forced the plaintiff to submit to drug and alcohol testing, pursuant to said regulations, when the circumstances did not justify such action.[44] The defendant, MBTA, claimed that the tests were required under the federal regulations as federally-mandated post-accident testing. However, the evidence and facts established herein (and otherwise) indicate the opposite.

1.      The plaintiff was subjected to "federally-mandated" testing as a result of the 'incident' that took place on October 19, 2017. The plaintiff should not have been forced to submit to testing, since, as previously stated, the 'incident' was not defined, by the federal regulations, as an 'accident.' There was no collision, nor did the plaintiff operate the bus in a way that is uncommon or unsafe. In fact, there is an abundance of evidence that discounts the plaintiff as contributing to the 'incident.' Those facts indicate that there was no basis for the defendant, MBTA, to impose post-accident testing on the plaintiff. Further, it was completely disregarded and was never even considered by the defendant, MBTA, that as a passenger of a (MBTA) bus, it is reasonable to expect during the course

---

[43] See 49 CFR 655.4. Accident is defined as follows: *"Accident means an occurrence associated with the operation of a vehicle, if as a result: (1) an individual dies; **or (2) an individual suffers bodily injury and immediately receives medical treatment away from the scene of the accident;** or (3) with respect to an occurrence in which the mass transit vehicle involved is a bus, electric bus, van or automobile, one or more vehicles (including non-FTA funded vehicles) incurs disabling damage as the result of the occurrence and such vehicle or vehicles are transported away from the scene by a tow truck or other vehicle; or (4) with respect to an occurrence in which the public transportation vehicle involved is a rail car, trolley car, trolley bus, or vessel, the public transportation vehicle is removed from operation."*
[44] See 49 CFR 655.44. The 'post-accident' testing regulations include the following: *"As soon as practicable following an accident not involving the loss of human life in which a public transportation vehicle is involved, the employer shall drug and alcohol test each covered employee operating the public transportation vehicle at the time of the accident **unless the employer determines, using the best information available at the time of the decision, that the covered employee's performance can be completely discounted as a contributing factor to the accident."***

of the route/trip, that the bus will very likely make random and sudden stops. The fact that

a passenger fell down, after not securing themselves or ensuring their own safety, does not

somehow translate to the plaintiff contributing to her fall. It is not uncommon for buses to

stop abruptly, frequently and suddenly for a multitude of reasons, none of which are

considered abnormal, excessive or in any way the fault of a bus operator. In this case, the

plaintiff used the brakes to stop the bus, and a female passenger lost her balance and

subsequently fell. The plaintiff's use of the brakes did not disturb, or affect, any other

passenger on the bus at the time and a witness [passenger] statement confirmed that the

female passenger fell down because she was not paying attention, and had not made any

attempt to securely hold on as the bus was moving (or stopping) or at any other time.[45] The

defendant, MBTA, presumably[46] classified the 'incident' as an 'accident' because (1) an

ambulance arrived on scene (which is standard practice regardless of whether an actual

injury is claimed or has truly occurred), and (2) at the insistence of the female passenger,

said ambulance transported her to the hospital from the scene.[47]

2.       Although it was an 'initial' decision,[48] made by the defendant, MBTA (by way of

the Inspector), to require the plaintiff to submit to post-accident testing, after the

---

[45] There is no evidence to support that the plaintiff had been operating the bus in a negligent or unsafe manner, or that he had contributed to the 'incident' in any way. The female passenger fell down on the bus due to her own failure to pay attention. The mere 'claim' of injury, or the fact that a passenger was taken to the hospital, does not give the defendant, MBTA, the authority to infer that an 'accident' took place. The female passenger insisted she be taken to the hospital, while the EMT on scene expressed and affirmed that transporting her to the hospital was unnecessary. The defendant, MBTA, can't define an 'incident' as an 'accident' when it is not completely applicable to the federal regulations. The defendant, MBTA, has a duty to properly comply with federal regulations as a term and condition to it receiving federal grant money. There are rules in place for a reason, and when those rules are bent, and broken, especially by an employer (such as the defendant, MBTA), there should be consequences.

[46] As is noted herein, several times, the plaintiff has been denied access to any and all documentation and records regarding the 'incident,' investigation, disciplinary hearing, disciplinary action and grievance procedure, which has made it so there is no way the plaintiff can say definitively what basis and/or justification was given by the defendant, MBTA, to support its enforcement and administration of federally-mandated drug and alcohol testing. *The plaintiff acknowledges that the defendant, MBTA, clearly enforced the testing because it defined the 'incident' as an 'accident' pursuant to 49 CFR 655.4(2), but he argues it was an incorrect application – there was no 'bodily injury' and the female passenger was transported to a hospital, due to her insistence, without actual reason, and in direct conflict with the EMT assessment.*

[47] See definition of an 'accident' in this respect, in 49 CFR 655.4, "(2) an individual suffers bodily injury and immediately receives medical treatment away from the scene of the accident."

[48] The plaintiff is willing to accept that the Inspector had not been acting in bad faith in his decision to drug and alcohol test him. It's most likely that the Inspector was "covering" himself and testing the plaintiff "just in case." However, the defendant, MBTA, is required to follow the federal regulations and apply them appropriately, which means ensuring its inspectors only test those employees that should be tested, not all employees "just in case." And,

investigation had been conducted and completed, the defendant, MBTA, <u>should have</u> disposed of the test results when it became clear that the 'incident' did not warrant such action against the plaintiff.

3.      The defendant, MBTA, pursuant to its own Drug and Alcohol Policy[49] as well as the federal regulations,[50] must determine whether the involved employee 'contributed' to the 'incident' and as such, should be (or should not be) tested for drugs/substances and alcohol, under its own and/or federal regulations and policies. In this case, the plaintiff had not done anything to 'contribute' to the female passenger falling down, but yet he was still[unjustly] subjected to 'federally-mandated' testing.

4.      The FTA holds the *"FTA Drug & Alcohol Program National Conference"* ("FTA Conference") each year. The FTA Conference in April 2017 published a PowerPoint presentation online that discusses the 'federally-mandated' testing procedures and addresses common misconceptions and errors that need to be avoided when determining whether or not an employee is required to submit to post-accident testing under federal regulations. The presentation states that it is a "common misconception" and "error" for an employer to assume that "testing should be performed just to be on the safe side." Also, the presentation references "decision-maker doesn't feel they have the authority to discount an operator's actions" as a "common misconception" and "error" that must not be practiced.[51] A copy of the aforementioned presentation is attached hereto as **"Exhibit M"** and is hereby incorporated and made a part of this complaint by reference herein.

63.     The plaintiff alleges and affirms that the disciplinary action and discharge issued and affirmed by the defendant, MBTA, against him, as previously stated, was based solely on the results of the drug test, which was enforced, and obtained, under questionable/invalid circumstances. That being said,

---

the defendant, MBTA, is not [supposed] to use test results it obtains without actual authority to discipline and discharge employees, such as the plaintiff.

[49] See *MBTA's Drug & Alcohol Policy (effective February 2014)* – referenced herein and attached to this complaint as **"Exhibit C."**

[50] See federal regulations: (1) 49 CFR 655; (2) 49 CFR 40; (3) P.L. 100-690, Title V, Subtitle D, "Drug Free Workplace Act of 1988"; and (4) the Omnibus Transportation Employee Testing Act of 1991.

[51] See pg. 5 of **"Exhibit M"** (slide #5) for the "Common misconceptions/errors to address" portion of presentation.

there is a question as to the validity of the disciplinary action and the discharge of the plaintiff, due to the fact that such actions were only issued and affirmed based on the improperly enforced drug test and the test results. If the defendant, MBTA, had followed the proper procedures outlined by the FTA/DOT regulations and did not (invalidly) force the plaintiff, without having the authority, to submit to post-accident testing, none of the aforementioned actions would have been taken and the plaintiff would [still] be employed as a full-time (per his promotion) Bus Operator.

    1.     The defendant, MBTA, used drug test results it had obtained without cause to impose and affirm a severe and life-altering disciplinary action (and discharge) against the plaintiff. The defendant, MBTA, should have done more to properly investigate the 'incident' and the circumstances by which testing was administered, and after doing so, the disciplinary decision should have been, at the least, minor and more appropriate.[52]

64.     The plaintiff alleges and affirms that the defendant, MBTA, also violated the CBA in its handling of the plaintiff's Grievance, to wit: the defendant, MBTA, failed to directly notify the plaintiff, in writing, of each decision made, at each step of the grievance process, with the reasons for which such decisions were made.[53]

65.     The plaintiff alleges and affirms that the defendant, MBTA, refused to produce documentation and records relating to the plaintiff's disciplinary hearing/action and the subsequent grievance procedure. The plaintiff has a right to access documents and records that relate to his employment, specifically pertaining to the disciplinary action issued on October 25, 2017, which includes but is not

---

[52] It should be noted that the plaintiff believes he should not have been disciplined at all because the testing was invalid. However, for purposes of this complaint, and in the general hope of resolution [reinstatement], the plaintiff doesn't disagree that disciplinary action should have been imposed, but he feels that the action shouldn't have been as excessive and punitive. The plaintiff has consistently conceded to the fact that he should receive discipline for the presence of marijuana metabolites in his urine – even though he had an explanation and it was unintentional and an accident. Given that there are conflicting issues, that lack support by which the defendant, MBTA, could discipline the plaintiff, at any level, it is unclear why there was such a refusal to reduce the disciplinary action and come to a resolution during the grievance process. As is discussed herein, it's also of concern that the defendant, Union, did not push for a resolution and simply accepted the denial by defendant, MBTA, at each step without [any] objection.

[53] The CBA grievance procedure outlines each step of the process, including the deadlines to file, answer and decide. The CBA requires that the defendant, MBTA, notify, the "employee Grievant" (and the Union), formally and in writing, of its decision to deny or approve the grievance, after each step. The plaintiff received one (1) 'notice' from the defendant, MBTA, dated March 12, 2018, which informed him of his discharge. That 'notice' did not reference, or indicate, that the discharge, or the 'notice' itself, was issued in connection with, or related to, the grievance procedure.

limited to any records or documents regarding the 'incident' and the investigation (initial findings and report as well as the extensive/thorough findings and report), the disciplinary hearing, and the grievance proceedings.

66.      The defendant, MBTA, breached its contract when it pursued discipline against the plaintiff and imposed it without just cause. The CBA, supported by the MBTA's Progressive Discipline Policy, expressly prohibits discipline [and discharge] against an employee without meeting the seven (7) just cause factors. The plaintiff's Grievance outlined those seven (7) factors and analyzed whether or not each had been met by the defendant, MBTA. The plaintiff showed that the defendant, MBTA, had not met all of the required seven (7) just cause factors, which thus infers a violation of the CBA. The aforementioned should have been an incentive for the defendant, MBTA, to negotiate and settle the disciplinary action with the defendant, Union, during the first steps of the grievance procedure. However, there appears to have been no resolution discussions at any point in the process, by either side.

67.      It is at this point that the plaintiff has been punished far more, and for far greater a time, than he was ever deserving. As was said, the defendant, MBTA, overstepped its (own) authority, and issued an unwarranted, extreme, punitive, and disproportionate disciplinary action (and discharge) against the plaintiff. The plaintiff was treated as though he had a history of bad behavior or was constantly reprimanded for serious discipline problems, but in fact the truth was (is) the opposite. The plaintiff was an employee who had been considered 'good enough' to be offered a promotion less than two (2) weeks before the disciplinary hearing, had never been in any kind trouble and exhibited only professionalism, dedication and a substantial amount of pride in his duties and responsibilities as a Bus Operator. It is disconcerting to know that the defendant, MBTA, has such a significant disregard when it comes to following the rules and policies it created and enacted, and has essentially been allowed to act, with respect to this matter, without consequence. Further, the defendant, MBTA, disciplined and discharged the plaintiff for his 'alleged' [minor] 'wrong-doings' and rule/policy/regulation violations, but yet [the MBTA] appears to have no respect for any of the rules, policies, regulations, and laws it's expected to comply with.

**COUNT 2: BREACH OF DUTY OF FAIR REPRESENTATION BY THE UNION**

68.        Established case law precedent states that "because of the importance of the rights given up by individual employees in the designation of an exclusive bargaining agent, grave constitutional problems would arise if there were no duty of fair representation."[54] The Supreme Court held, in *Bowen v. United States Postal Service,*[55] that "it is established doctrine that all unions acting as exclusive bargaining representatives under the authority of the National Labor Relations Act, 29 U.S.C. §§ 151-187, owe employees the duty of fair representation." The Court also stated, in *Bowen*, that "by seeking and acquiring the exclusive right and power to speak for a group of employees, the union assumes a corresponding duty to discharge that responsibility faithfully – a duty which it owes to the employees whom it represents."[56] In *Humphrey v. Moore,*[57] the Court held that "the duty of fair representation is not limited to negotiation of a collective bargaining agreement, but includes administration of that agreement and processing of grievances thereunder." Where the union has obtained exclusive representation of the employees, the employees have accepted a restriction of their individual rights.[58]

69.        A breach of the duty of fair representation occurs if a union's actions toward an employee are "arbitrary, discriminatory or in bad faith."[59] Although a union has discretion in deciding what grievances to process, and to what extent, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion."[60]

70.        The plaintiff alleges and affirms that the defendant, Union (and all union representatives, including the defendants, Hogan and O'Brien), breached its duty of fair representation by mishandling the plaintiff's Grievance, and by doing so in an arbitrary and perfunctory manner, as well as in bad faith.

71.        The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation in its [arbitrary] representation of the plaintiff in the grievance procedure. The defendant, Union, failed to present the case or represent the plaintiff as it would any other union member employee in

---

[54] Steele v. Louisville & N.R.R., 323 U.S. 192, 198-199 (1944).
[55] Bowen v. United States Postal Service, 459 U.S. at 218 (relying on Vaca v. Sipes, 386 U.S. 171 (1967).
[56] Bowen v. USPS, 459 U.S. 212, 226 (1983).
[57] Humphrey v. Moore, 375 U.S. 335 (1964).
[58] Summers, *The Individual Employee's Rights Under The Collective Agreement: What Constitutes Fair Representation?,* 126 U. PA. L. REV. 251, 256 (1977).
[59] Vaca v. Sipes, 386 U.S. 171, 190 (1967).
[60] *Id. at 191.*

the same situation. This reflects a 'discriminatory' approach by the defendant, Union.[61] The plaintiff

acknowledges that unions are permitted a wide range of reasonableness in representing the often-conflicting

interests of employees.[62] However, in this case, the defendant, Union, not only failed to assist the plaintiff

during the grievance procedure, but it *wrongly* refused to do so, without reason and in bad faith, which is

unreasonable. The *wrongful refusal* by the defendant, Union, to act, present or represent the plaintiff,

resulted in his Grievance being denied, at each level, and ended with his discharge. The plaintiff believes,

with justification and reason, that the defendant, Union, would have acted differently if it had been

processing any other union member employee's grievance in the same (or similar) situation. The defendant,

Union, willingly ignored the merits of the plaintiff's Grievance, and allowed, with no objections, the denial

of it by the defendant, MBTA, at each step/level. The defendant, Union, appears to have made no attempt

to resolve the matter and/or obtain any relief or remedy for the plaintiff. There were extremely serious

issues at hand, and the defendant, Union, should have demanded that the defendant, MBTA, either (1)

justify the disciplinary actions it took, or (2) re-evaluate those actions imposed and correct the errors made

to rectify the matter. The plaintiff should have been reinstated, with back-pay, at [one of] the earliest stages

of the grievance process. It's unclear what the defendant, Union, actually presented since it had no success,

at all, in settling or resolving the Grievance in any way. It is concerning that the defendant, Union, was

incapable of settling the plaintiff's Grievance early on, or all, especially when the evidence against the

defendant, MBTA, was substantial and strong. It was the responsibility of the defendant, Union, to question

the disciplinary action and negotiate the appropriate adjustment that would reflect a more suitable

disciplinary action. The defendant, Union, should have accepted nothing short of [guaranteed] reinstatement

---

[61] "To establish discrimination, a plaintiff must show animus on behalf of the union and that the plaintiff was treated differently than others" *Spellacy v. Airline Pilots Ass'n, 156 F.3d 120, 130 (2d Cir. 1998); Thompson v. Aluminum Co., 276 F.3d 651, 658 (4th Cir. 2002) (stating that issue of discrimination and bad faith focuses on subjective motivation by union).*

[62] In the *Bowen* case, the Court paid little attention to "the union's exercise of its discretionary authority," which is what it had previously viewed as the foundation of the grievance procedure. The Supreme Court, before *Bowen*, held that peaceful resolution of employer/employee disputes and efficient functioning of the grievance procedure mandate that the union exercise its discretion in determining which grievances should be pursued through arbitration and which claims should be settled prior to the most time-consuming and expensive step. Prior to *Bowen*, Supreme Court precedent had accordingly expressly refused to grant the individual employee an absolute right to have his grievance taken to arbitration (see *Vaca v. Sipes*). Some interpret the holding[s] in *Bowen* as creating a "virtually guaranteed" right to arbitration – as a practical matter, unions will feel compelled to pursue anything other than the most specious grievances through arbitration.

of the plaintiff, with full back-pay.[63] There really doesn't seem to be a valid [excusable] reason to explain why the defendant, Union, was unable to resolve the Grievance prior to the arbitration phase.

72.      The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation to the plaintiff when it refused to acknowledge, and deliberately ignored, multiple requests by the plaintiff to produce documentation and records pertaining to the grievance procedure (and disciplinary hearing/action).

        1.      The plaintiff had (has) a right to know what occurred during the grievance process and why the defendant, Union, allowed the defendant, MBTA, to repeatedly deny the plaintiff's Grievance. The plaintiff had (has) a right to review the case that the defendant, Union, presented at all steps of the grievance process. The plaintiff was (is) concerned as to how the defendant, Hogan, and by default, the defendant, Union, represented him during the grievance process and was (is) denied any ability to do review or be allowed access to that information.

73.      The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it intentionally excluded and refused to allow any participation by the plaintiff, during the grievance procedure. The defendant, Union, proceeded without any involvement by the plaintiff and gave very limited, if any, information, to the plaintiff to explain what happened at each specific level/step. As is stated herein, the plaintiff was kept 'in the dark' by the defendants, Union and Hogan, with respect to his Grievance. Truthfully, the plaintiff has absolutely no knowledge of what actually happened with his Grievance, other than that the defendant, MBTA, denied it at each step/level. Numerous important facts, and aspects, of the grievance procedure have never been disclosed to the plaintiff, including but not limited to: (1) when each step in the grievance process took place; (2) what was discussed at each step; (3) who attended each step; (4) what meetings/hearings were held and why/when; (5) what reasons were given by the defendant, MBTA, to justify the decisions to deny the Grievance at each step; (6) what was done by the defendant, Union, on behalf of the plaintiff; (7) what efforts were made by the defendant, Union, at each

---

[63] The plaintiff's [only] concerns were (are) his getting back to work; the plaintiff has remained willing to accept reinstatement, at the lowest [bus operator] position, with or without back-pay, from the beginning, as will be discussed in the Prayer for Relief portion of this complaint.

step; (8) who (if not defendant, Hogan) was present for the defendant, Union, at each step; (9) why was the defendant, MBTA, not confronted and asked to justify its decision when it denied the Grievance [at each step]; and (10) why the plaintiff had never been asked to speak at or simply attend any of the steps, meetings or hearings at all. **Is this considered standard practice? Does this kind of conduct reflect the normal and usual way the defendant, Union, processes and handles an employee Grievance, especially ones that relate to the highest and most severe discipline [and potential discharge] such as the plaintiff's?**

74.     The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it failed to properly notify, in writing or otherwise, the plaintiff of the decisions made by the defendant, MBTA, to deny the Grievance at each step, and explain the reasons why the Grievance was continuously denied. The defendant, Union, didn't contact the plaintiff to discuss the grievance process, or notify him of what had happened, in detail, after each step. In doing so, the defendant, Union, failed to inform him of (or even raise) the most important and crucial aspects of his case. The plaintiff was only able to find out that his "Grievance had been denied at [each] level," with no more or less than that. The defendant, Union [and Hogan], never initiated contact with the plaintiff to relay the status of his Grievance; the plaintiff had to ask, multiple times, about the status to even find out that it had been denied.

75.     The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it *wrongfully refused* and denied to proceed with the plaintiff's Grievance to arbitration, without reason, and it refused and ignored the requests of the plaintiff to present the reason why the Executive Board denied to proceed to arbitration with his Grievance.[64]

76.     The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it deliberately refused to allow the plaintiff his right to appeal the Board's decision to deny arbitration at the Membership Meeting on May 15, 2018 and continued to breach its duty in this respect when it ignored the plaintiff's numerous attempts to discuss any options that would give him the ability to exercise his right to appeal at the next month's [June] meeting, or otherwise.

---

[64] A union is vested with considerable discretion not to pursue a grievance, as long as their actions are "not improperly motivated, arbitrary, perfunctory or demonstrative of inexcusable neglect" *Baker v. Local 2977, State Council 93, An. Fed'n of State, County & Mun. Employees. 25 Mass. App. Ct. 439, 441 (1988).*

1.         The defendant, Union, harmed the plaintiff when it failed to provide adequate and timely notice to the plaintiff of the Membership Meeting on May 15, 2018. In doing this, the defendant, Union, delayed the plaintiff's notice of the Board's decision and thus removed his right to appeal that decision. The plaintiff was denied his right to appeal due to the intentional acts of the defendant, Union, and as a result, the plaintiff was unable to address his fellow union members and ask them to vote to overturn the Board's decision not to proceed to arbitration.

77.      The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it (1) simply just ignored the merits of his Grievance; (2) denied arbitration without any reason;[65] and (3) made it impossible for the plaintiff to have any recourse or remedy in response to the unjust disciplinary action issued by the defendant, MBTA.

1.         Further, the defendant, Union, breached its duty of fair representation due to the fact that there is evidence to suggest that it would not have been able to proceed to the arbitration phase, *even if the plaintiff had been able to attend the Membership Meeting on May 15, 2018.* As has been the issue from the start, the failure of the defendant, Union, to allow the plaintiff to be involved at all during the grievance process, and its refusal to properly and adequately notify the plaintiff, and inform him of the dates in which steps in the grievance process took place and were decided on, has left the plaintiff with no choice but to estimate in terms of deadlines and dates in the grievance process. As a result, the plaintiff believes that the date [deadline] in which an arbitration request could be made by the defendant, Union, to the defendant, MBTA, may have already passed before the Membership Meeting on May 15, 2018.[66]

---

[65] "A union may refuse to process a grievance or handle the grievance in a particular manner for a multitude of reasons but it may not do so without reason" *Griffin v. Auto Workers*, 469 F.2d 181 (4th Cir. 1972).

[66] Although it is impossible for the plaintiff to confirm [almost] all dates related to the grievance procedure, as a result of the actions (inactions) of all defendants named herein, he can confirm that he was 'formally' discharged as of March 12, 2018. The date of the discharge letter/notice is consistent with the approximate period of time in which the plaintiff's Grievance likely would have been reviewed and decided on by the GM (based on the timeline and deadlines set forth in the CBA). Even though the discharge letter/notice does not specify whether [or not] it was connected with the plaintiff's Grievance [filed in November 2017], the plaintiff will assume it was, for purposes of this analysis. Also, the e-mail from defendant, Hogan, that was dated March 2, 2018 stated "Grievance denied at GM." That being said, the CBA requires that requests for arbitration be filed within sixty (60) days from the date in which a grievance is

2.      Even if the plaintiff had been afforded the right to appeal the Board's decision, and even if the union members voted to progress his Grievance to arbitration, the plaintiff is concerned about whether the defendant, Union, could have successfully submitted the arbitration request. Since there is evidence to suggest that the deadline to request arbitration had passed prior to the [May] Meeting, the plaintiff asks: was that an intentional [and malicious] attempt to sabotage the plaintiff's ability to proceed to arbitration? It seems as though the defendant, Union, had no intention of giving the plaintiff the right to appeal, or honor any vote if one had occurred and been in the plaintiff's favor, which would reflect a breach of its duty of fair representation.

78.      The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it allowed the defendant, MBTA, to [successfully and undisputedly] deny the plaintiff's Grievance at each step. The defendant, Union, clearly made no objection and raised no issue against the defendant, MBTA, in any respect.[67] The defendant, Union, also [presumably] never addressed or questioned the failure of the defendant, MBTA, to properly notify the plaintiff in compliance with the grievance procedure set forth in the CBA, or in any other respect. The defendant, Union, allowed the defendant, MBTA, to act without consequence, and in violation of the CBA at each grievance step and in general.

79.      The plaintiff alleges and affirms that the defendant, Union, breached its duty of fair representation when it failed to disclose, or even make note of the fact, that the plaintiff had the right to file a new grievance, directed at and in dispute of the discharge issued on March 12, 2018.

1.      The defendant, Union, continued to process the plaintiff's Grievance (filed in November 2017), after the discharge was issued on March 12, 2018, as though it extended to the discharge and was filed in dispute of it. The plaintiff was unaware of his right to file

---

denied by the GM. If the e-mail date of March 2, 2018 is applied as "the date in which a grievance is denied by the GM," that would mean the request for arbitration had to be filed by or before Tuesday, May 1, 2018. If we use the discharge letter/notice date of March 12, 2018, that would mean the request for arbitration had to be filed by or before Friday, May 11, 2018. With that said, both [deadline] dates are before the Membership Meeting on May 15, 2018.
[67] If this is not accurate, the plaintiff has no way of knowing, since he has been denied any access to see or review what the defendant, Union, did on his behalf in the grievance procedure.

a new grievance and only recently became aware of it as he was researching and preparing this complaint.[68] As is stated herein, the plaintiff was prohibited, pursuant to the CBA, from filing a grievance directly with the defendant, MBTA to dispute the discharge, because of the 'exclusive bargaining agent' right of the defendant, Union. As such, the plaintiff had to rely, trust and depend on the defendant, Union (and union representatives), as the exclusive bargaining agent, to dispute disciplinary action of any kind. The defendant, Union, should have discussed all possible options with the plaintiff, which included the filing of a [new] grievance directly disputing the discharge, but it failed to do that [as well].

80.       If the defendant, Union, exhibited the very same actions (inactions) regularly and treated all union member employees as it did the plaintiff, it would [undoubtedly] face severe and significant consequences and would most likely even be prohibited from continuing to operate as a labor organization.

81.       The breach of the duty of fair representation by the defendants, Union, Hogan and O'Brien, resulted in, and contributed to, the confirmation of the suspension and led to the eventual discharge of the plaintiff. The defendants, Union, Hogan and O'Brien, did not act in compliance with the CBA and substantially deviated from the standards in place relative to ensuring that all union member employees are treated fairly and equally. *"Under the doctrine, a union must represent fairly the interests of all bargaining-unit members during the negotiation, administration and enforcement of collective bargaining agreements."[69]*

82.       Pursuant to case law, and any other applicable laws, the plaintiff must prove that the defendants, Union, Hogan and O'Brien, handled his Grievance arbitrarily, in a discriminatory manner or in bad faith. The plaintiff doesn't allege simple negligence or poor judgment, which is usually ruled, by the courts, as not unreasonable enough and thus not a breach of the duty of fair representation. The plaintiff has outlined the conduct of the defendant, Union, and detailed multiple acts it committed over the course

---

[68] The plaintiff only recently discovered (by research in preparation of filing this complaint) that the first disciplinary action (suspension) issued on October 25, 2017 was actually separate from the second disciplinary action (discharge) issued on March 12, 2018, in terms of grievances. The plaintiff was never informed by the defendant, Union, that he had the right to file a grievance directly disputing the second disciplinary action (discharge). The Grievance filed in November 2017 was treated, by the defendant, Union, as if it was a "discharge grievance" when in reality, the plaintiff had never directly addressed the discharge, because that disciplinary action had not been decided or issued.
[69] IBEW v. Foust, 442 U.S. 42 (1979).

of a seven (7) month period, none of which can be defined as only "negligent" and all of which reflect more than just "poor judgment." This complaint has referred back to the case law and precedent set by the Supreme Court over the years with respect to the Duty of Fair Representation. The courts have consistently held that a breach of the duty of fair representation occurs only if a union handles an employee's grievance in bad faith or in an arbitrary, perfunctory, or discriminatory manner. In this case, the defendant, Union, did exhibit bad faith[70] in its handling and processing of the plaintiff's Grievance – and there is evidence to support that the plaintiff's Grievance was handled and processed in an arbitrary[71] and perfunctory[72] manner.

83.     There are several definitions of the words (or terms): arbitrary, perfunctory and in bad faith, as is shown and discussed herein. But, even so, there is a basic interpretation of those words (and terms) with respect to the Duty of Fair Representation and the kind of conduct and actions exhibited by a union and its representatives that represent a breach of that duty. This complaint, and the facts stated herein, reflect extensive examples of what a union should not do, and overall constitutes [a] breach of the duty of fair representation.

84.     It has been universally agreed that a union should take considerable care to ensure that its treatment of an employee's claim cannot be viewed as arbitrary, perfunctory, or negligent. The union must, at the very least, undertake a thorough investigation of all available evidence,[73] analyze the claim in light of applicable contract provisions and any other relevant considerations,[74] and make certain that a decision not to pursue a grievance to arbitration is <u>well-reasoned</u> and based on a consideration of the claim's merits, or similar traditional concerns.[75] The defendant, Union (and its representatives), did not process and handle

---

[70] The term **bad faith**, in this regard, means: (1) "intending to deceive;" (2) "intentionally dishonest act(s) by not fulfilling legal or contractual obligations;" (3) "misleading another;" (4) "entering into an agreement without intentions, or means, to fulfill it;" and/or (5) "violating basic standards of honesty in dealing with others."

[71] The word **arbitrary** has several definitions, but while slightly different, they all reflect a similar basic premise as to what the word itself means. For example, *arbitrary* is defined as "being based on random choice or personal whim, rather than on any reason or system." Some consider an *"arbitrary decision"* as (1) "being done without concern for what is fair or right;" (2) "being contingent solely upon one's discretion;" and/or (3) "existing and coming about seemingly at random, or by chance, or as an unreasonable act of individual will without regard for facts or applicable law."

[72] The word **perfunctory**, like *arbitrary*, has more than one set definition. *Perfunctory* is best defined as follows: (1) "carried out without a minimum of effort or reflection;" (2) "done in a careless or superficial manner;" and/or (3) "lacking interest, care or enthusiasm."

[73] Comment, *Breaching the Duty of Fair Representation: The Union's Liability*. 17 J. MAR. 415 at 154 (1984).

[74] *Id.* at 156.

[75] Savner, *The Application and Meaning of the Duty of Fair Representation: Representing the Wrongfully Discharged Worker*. 13 Clearinghouse REV. 13, at 17 (1979).

the plaintiff's Grievance in accordance with the aforementioned, and it failed to give a reason for the decision not to pursue arbitration. As such, it is clear that the defendant, Union, breached its duty of fair representation.

## VI. PRAYER FOR RELIEF

In *Vaca v. Sipes,* the Supreme Court held than an employee, such as the plaintiff, who proves that his employer violated the labor agreement and that his union breached its duty of fair representation, may be entitled to recover damages from both the union and the employer.[76]

**Now wherefore, the plaintiff prays that this Court grant him the following relief:**

The plaintiff's sole objective, is [and has always been] to secure his employment as a Bus Operator. The plaintiff is now willing [and has always been], to accept the sole remedy of reinstatement, at the lowest possible level [part-time] without any compensation, of any kind, or any damages, backpay, etc. However, the plaintiff has shown that it has been impossible, thus far, to obtain a resolution by way of the grievance procedure, and asks the Court to review the facts herein and consider the reinstatement request aforementioned. The plaintiff also asks this Court to review and consider the additional requested forms of relief to follow, and determine if the plaintiff is entitled to any additional remedy or relief.

In light of the uncertainties in this case[77] the plaintiff has expressed concern about whether or not arbitration would even be possible.[78] Nevertheless, the plaintiff asks this Court, [if it sees fit] to compel the defendants, Union and MBTA, to arbitrate the disciplinary action[s], which includes both the

---

[76] Vaca v. Sipes, 386 U.S. 171 (1967).

[77] The uncertainties of the [Grievance] case surround and reflect (1) the complete disregard to notify or inform, and (2) the general exclusion of, the plaintiff in his Grievance case. All of the defendants named herein failed to provide, notify or inform the plaintiff of the specific, and important, dates in which his Grievance was progressed (i.e. what dates the Grievance was heard at the first, second, third, etc. steps and what dates the Grievance was denied at the first, second, third, etc. steps). Additionally, the plaintiff has no knowledge of who specifically (names of the individuals) denied his Grievance at each step and he was never given the reasons, by each individual at each step, that supported, and explained, those decisions to deny. The plaintiff has (is) been denied access and excluded by the defendant, Union, which means he has no knowledge of what the defendant, Union, put together/presented on his behalf and in his defense, throughout the grievance procedure. The plaintiff, in connection with not knowing the dates in which each specific step occurred, was also denied the ability to attend, assist, participate or be present at any meetings, hearings, etc. and further was never informed or notified of what was discussed and took place at those meetings, hearings, etc., by any of the defendants named herein.

[78] In *Hines v. Anchor Motor Freight, Inc.* 424 U.S. 554 (1976), the Court held that "if a court finds a breach of the duty of fair representation, times limits contained in the Collective Bargaining Agreement may be set aside."

suspension and the discharge.[79] *"If a union's failure to pursue a grievance constituted a breach of the union's statutory duty to the employee, then an order compelling arbitration was a possible remedy."*[80]

The plaintiff asks this Court, if it rules in favor of his position and affirms the claims made herein, with respect to reinstatement of his employment, to order the defendant, MBTA, to: (1) Reinstate him, with full [or partial] back-pay,[81] immediately and retroactively as of October 25, 2017; (2) Remove any and all references to the disciplinary actions, the suspension and the discharge, from his employee record and fully restore (retroactively, as applicable and stated above) all benefits and vacation/sick time [or to act as this Court determines appropriate in this respect]; and (3) Reinstate him to the position of [full-time] Bus Operator, which is to take effect as of the date that he would have been effectively promoted had he not been [wrongfully] disciplined and discharged. In this respect, the plaintiff asks this Court to determine the date in which he would have been [effectively] promoted and considered a full-time Bus Operator,[82] which would be based on the standard/average amount of time it usually takes for an MBTA employee to be [effectively] promoted to the upgraded position after an offer and acceptance has been made [or to reinstate to the position this Court determines appropriate].

The plaintiff asks this Court, *in the event that his employment is not reinstated as a remedy of this Court*, to allow him to file a [new] grievance, and to waive any and all possible disputes or determinations of untimeliness,[83] in direct response to the defendant, MBTA, discharging his employment

---

[79] The *Vaca Court*, held that "an order compelling arbitration should be viewed as one of the available remedies when a breach of duty is proved." *See Vaca v. Sipes*, 386 U.S. 171 (1967).

[80] *Id.* at 196.

[81] The plaintiff's relief regarding back-pay is further discussed in Par. 91.

[82] The defendant, MBTA, should be able to produce records that reflect the average time (days, months, etc.) an employee waits from when a promotion is offered/accepted to the effective promotion start date. This average time can determine what date the plaintiff would have been effectively promoted to full-time had he not been suspended, and discharged. NOTE: The plaintiff remained suspended from 10/25/17-3/12/18 (98 working/business days; 138 calendar days). The disciplinary action imposed a 70-day suspension, but it was technically 98-days, without any word to the plaintiff to explain why the suspension was still in effect, and without providing any options to "return to duty." The discharge took effect on March 12, 2018, which currently reflects a period of 173 working/business days and 247 calendar-days between 3/12/18-11/14/18. **In total, if the plaintiff had not been disciplined (or discharged) he'd have been paid from 10/25/17 to the current date (11/14/18), which is 271 working/business days, or 385 calendar days.**

[83] This complaint outlines the failures of the defendant, Union, with respect to a new grievance filing. The plaintiff was never informed of his right to file a grievance directly disputing the discharge issued on March 12, 2018. The defendant, Union, treated the plaintiff's Grievance (filed in November 2017) as if it extended to the discharge, which was 'decided' four (4) months after the plaintiff filed his Grievance. The plaintiff would have immediately prepared and [timely] filed a new grievance [disputing his discharge] had he known that he could, or that he should. Due to the actions and conduct of the defendant, Union, in this respect, the plaintiff is asking this Court to allow him, if necessary,

in March 2018.[84] *Further, in this respect, although it may be redundant and unnecessary to state, the plaintiff asks this Court to compel the defendant, Union, to bring the aforementioned [new] grievance to arbitration should it not have success in settling the dispute with the defendant, MBTA, during the previous grievance procedure steps.*

The plaintiff asks this Court, *in the event that his employment is not reinstated as a remedy of this Court, and if this Court shall not allow the filing of a [new] grievance directly disputing his discharge (as is described above),* to order the defendant, Union (and its representatives) to progress his Grievance filed in November 2017 to arbitration, immediately. *Further, the plaintiff asks this Court, in this respect, to order the defendant, MBTA, to submit to the aforementioned arbitration without dispute or issue. Lastly, in this respect, the plaintiff asks this Court, to waive any timeliness requirements or claims, to ensure that an arbitrator cannot refuse to hear the Grievance or decide on the proper remedies and awards, if any.* The plaintiff asks this Court for these arbitration-related remedies to ensure the plaintiff is made whole.

The plaintiff asks this Court to allow him monetary compensation, to be paid by the defendants, MBTA and Union, which should reflect retroactive back-pay as of October 25, 2017 through the current and present date.[85] In accordance with case law precedent, the liability [on back-pay] should be apportioned between the defendants.[86]

The plaintiff asks this Court to award him punitive damages against the defendant, MBTA, in the amount of $100,000.00 for its (1) breach of [contract] the CBA, (2) the wrongful suspension and termination/discharge, and (3) its violation of the plaintiff's right to privacy.

---

to file a [new] grievance now, disputing his discharge. Additionally, the plaintiff also asks this Court to waive the timeliness requirement, as a remedy to the plaintiff.

[84] As it has been established herein, the Grievance filed in November 2017 was based on the disciplinary action issued on October 25, 2017 – a 70-day (unpaid) suspension and a *'recommendation for discharge.'* It was directly disputing the suspension, and only briefly discussed the *'recommendation for discharge'* since it was, at that time, only a 'recommendation,' and because the plaintiff hadn't anticipated discharge as a probable result, outcome or action.

[85] As is referenced herein, the retroactive back-pay (if this Court grants reinstatement of the plaintiff to full-time bus operator, in accordance with the promotion offered and accepted on October 12, 2017), should be calculated to reflect two (2) amounts: the first being the back-pay due to the plaintiff with respect to his part-time position, which would be applied from October 25, 2017 to the date in which he would have been promoted; the second being the back-pay due to the plaintiff with respect to his full-time position, which would be applied from the presumed/probable promotion start date to the current and present date.

[86] The *Bowen* Court created a single remedy for which both the employer and union are liable according to their respective faults *Bowen v. USPS, 459 U.S. at 230.*

The plaintiff asks this Court to award him compensatory damages against the defendant, Union, in the amount of $50,000.00.

The plaintiff asks this Court to award him compensatory damages against the defendant, MBTA, in the amount of $150,000.00.

The plaintiff asks this Court to award him monetary compensation, to be paid by the defendants, MBTA and Union, apportioned accordingly, for any and all attorney's fees, costs or other legal expenses, should those expenses be ruled as payable by the defendants unto the plaintiff by this Court.

The plaintiff asks this Court to consider and grant any other relief it deems just and equitable.

The plaintiff demands, if necessary and only as applicable, a trial by jury, with respect to the monetary damages sought, to ensure that he is made whole and that all defendants named herein are justly held responsible and liable.[87]

---

[87] In *Browlee v. Yellow Freight Systems, Inc.*, a discharged employee was entitled to a jury trial in a hybrid § 301/fair representation suit against his employer and union, even though he requested equitable as well as legal relief. The jury must decide the questions of breach of contract, breach of the duty of fair representation, and the amount of monetary damages. Then the judge decides whether equitable relief, such as reinstatement, is appropriate. 921 F.2d 745, 136 LRRM 2017 (8th Cir. 1990)

## VII. Verification

I, Robert Charles Cabral, Sr., verify under the pains and penalties of perjury that the facts stated herein are true and accurate to the best of my personal knowledge and belief.

Respectfully Submitted:

Dated: _11.13.2018_

**Robert C. Cabral, Sr., Pro Se**
328 Copeland Street, Apt. #2F
Quincy, MA 02169
c/o Taylor Orton
Barr & Cole
1172 Beacon Street, Suite 202
Newton, MA 02461