UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT C. CABRAL, SR.,
    Plaintiff,

v.

                                 CIVIL ACTION NO.
                                 18-12404-NMG

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, BOSTON CARMEN'S UNION
LOCAL 589, PATRICK HOGAN, AND
JOHN O'BRIEN,
    Defendants.

**REPORT AND RECOMMENDATION RE:
DEFENDANTS BOSTON CARMEN'S UNION, LOCAL 589'S, PATRICK HOGAN'S,
AND JOHN O'BRIEN'S MOTION TO DISMISS PLAINTIFF ROBERT C. CABRAL,
SR.'S COMPLAINT (DOCKET ENTRY # 9); DEFENDANT MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY'S MOTION TO DISMISS PLAINTIFF ROBERT C.
CABRAL, SR.'S COMPLAINT (DOCKET ENTRY # 30)**

**June 18, 2019**

**BOWLER, U.S.M.J.**

Pending before this court are motions to dismiss filed by
defendant Boston Carmen's Union Local 589 ("the union");
defendant Patrick Hogan ("Hogan"), a union delegate; defendant
John O'Brien; and defendant Massachusetts Bay Transportation
Authority ("the MBTA") (collectively "defendants").[1]  (Docket

---

[1]  The union points out that the correct name of the president of
the union is James O'Brien.  (Docket Entry # 10, p. 1).
Inasmuch as the complaint identifies defendant John O'Brien as
the president of the union, union president James O'Brien
("O'Brien") is the intended defendant in the complaint.  See In
re Asacol Antitrust Litig., Civil Action No. 15-12730-DJC, 2016
WL 4083333, at *3 n.1 (D. Mass. July 20, 2016) (because

Entry ## 9, 30).  Plaintiff Robert C. Cabral, Sr. ("Cabral" or "plaintiff") opposes both motions.  (Docket Entry ## 13, 38). After conducting a hearing on April 1, 2019, this court took the motions (Docket Entry ## 9, 30) under advisement.

PROCEDURAL BACKGROUND

Cabral initiated this action on November 15, 2018.  He seeks damages and injunctive relief against the MBTA for imposing "unwarranted and excessive disciplinary action" and for failing to comply with the grievance procedure outlined in a collective bargaining agreement between the MBTA and the union, of which he was a member.  (Docket Entry # 1, p. 4).  The complaint sets out the following claims against the MBTA:  (1) wrongful discharge in breach of the collective bargaining agreement ("CBA") in imposing "excessive and unwarranted discipline" (Docket Entry # 1, pp. 19-20) (Count I); (2) violation of United States Department of Transportation ("DOT") regulations, specifically those administered by the Federal Transportation Authority ("FTA"), 49 C.F.R. § 655 (Docket Entry # 1, ¶ 62) (Count III); and (3) violation of the Fourth Amendment right to privacy under 42 U.S.C. § 1983 ("section

"complaint makes clear that Warner Chilcott Company LLC is an intended party, the Court considered it named and analyzed the motions accordingly").

1983") (Docket Entry # 1, ¶ 61) (Count IV).[2]  The pro se complaint also sets out a claim against the union, Hogan, and O'Brien for breach of the duty of fair representation (Count II).[3]  (Docket Entry # 1, p. 26).

The complaint further states that plaintiff brings the duty of fair representation claim against the union (Count II) and the breach of the CBA claim against the MBTA (Count I) as a "'hybrid § 301'" claim under the Labor Management and Relations Act ("LMRA"), 29 U.S.C. § 185 ("section 301").  (Docket Entry # 1, p. 3).  Plaintiff's opposition to the union's motion to dismiss states that this was an unintentional error and that the "'hybrid'" claim instead arises under the Railway Labor Act

---

[2]  The pro se complaint denotes counts I and II by separate headings.  (Docket Entry # 1, pp. 19, 26).  In addition to the breach of the CBA claim, Count I includes the right to privacy claim and the DOT regulations claim in this count.  To distinguish these claims from the breach of the CBA claim in Count I, this court refers to the DOT regulations claim as Count III and the right to privacy claim as Count IV.  As to the Fourth Amendment privacy claim, "'a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but [rather] must utilize 42 U.S.C. § 1983.'"  Bishay v. Cornetta, Civil Action No. 17-11591-ADB, 2017 WL 5309683, at *3 n.4 (D. Mass. Nov. 13, 2017) (citation omitted), appeal filed, No. 18-1383 (May 3, 2018).  Inasmuch as plaintiff is proceeding pro se and refers to a claim under section 1983 in opposing the motion, this court construes the Fourth Amendment privacy claim (Count IV) as brought under section 1983.

[3]  Without objection, plaintiff agreed to dismiss Hogan and O'Brien in a supplemental memorandum filed on April 9, 2019.  (Docket Entry # 45, p. 1).  See Fed. R. Civ. P. 41(a).  Accordingly, it is not necessary to address the claim in Count II against these defendants.

("RLA"), 45 U.S.C. §§ 151—52.  (Docket Entry # 13, pp. 2-4).  In the meantime, plaintiff's opposition to the MBTA's motion to dismiss "'reassert[s]' the applicability of the LMRA."  (Docket Entry # 38, p. 9).

Defendants argue that the complaint fails to state a claim for relief and seek dismissal under Fed. Rule Civ. P. 12(b)(6) ("Rule 12(b)(6)").  (Docket Entry ## 9, 30).  The union also argues that, because the complaint fails to state a claim under the LMRA or the RLA, this court lacks jurisdiction to hear the claim against it.  (Docket Entry ## 10, 21).  The MBTA asserts the same and further argues that because "[p]laintiff's invasion of privacy claim cannot stand," neither can that claim serve as a basis for this court's jurisdiction.  (Docket Entry # 30, p. 1).  The MBTA alternatively seeks a dismissal under Fed. R. Civ. P. 12(b)(1).  (Docket Entry # 30).

<u>STANDARD OF REVIEW</u>

When considering a motion to dismiss under Rule 12(b)(6), a court "accept[s] as true all well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs."  <u>Gargano v. Liberty Int'l Underwriters, Inc.</u>, 572 F.3d 45, 48 (1st Cir. 2009).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>Miller v. Town of Wenham</u>, 833 F.3d 46, 51 (1st Cir. 2016).  While "[t]his

4

standard is 'not akin to a "probability requirement," . . . it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (internal citations omitted); Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011).  When a complaint fails to "state a facially plausible legal claim" or fails to support "'the reasonable inference that the defendant is liable for the misconduct alleged,'" a Rule 12(b)(6) dismissal is appropriate.  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (internal citations omitted); Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 6, 11-12 (1st Cir. 2011) (internal citations omitted).

"Exhibits attached to the complaint are properly considered part of the pleading" and are therefore part of the Rule 12(b)(6) record.  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal citations omitted).  Courts also "hold pro se pleadings to less demanding standards than those drafted by lawyers."  Boivin v. Black, 225 F.3d 36, 43 (1st Cir. 2000).  "However, pro se status does not insulate [a] party from complying with substantive and procedural law."  Garrett v. Ill. Attorney Gen., Civil Action No. 14-10217-RWZ, 2014 WL 652614, at *2 (D. Mass. Feb. 18, 2014) (citing Ahmed v. Rosenblatt, 118 F.3d 886 (1st Cir. 1997)).  Adhering to this standard, the facts are as follows.

FACTUAL BACKGROUND

On the evening of October 19, 2017, Cabral, then a full-time bus operator employed by the MBTA, was driving his assigned bus route when an "'incident'" occurred.  (Docket Entry # 1, pp. 5, 6).  In order to avoid a collision with a vehicle that "suddenly swerved" in front of the bus, Cabral applied the brakes, and a passenger who was "not holding onto anything" "lost her balance and fell on her arm/wrist/hands."  (Docket Entry # 1, p. 6) (Docket Entry # 1-2, p. 6).  Cabral pulled the bus over to the side of the road and contacted "dispatch," which sent an MBTA "Inspector" and an ambulance to the scene.  (Docket Entry # 1, p. 7).  An EMT who arrived with the ambulance assessed the passenger's arm/wrist/hands and "determined that there was no further medical attention needed or required." (Docket Entry # 1, p. 7).  The passenger nonetheless "insisted on" being taken to the hospital and "did in fact proceed to the hospital with the EMT on scene."  (Docket Entry # 1-2, pp. 6–7).

"[A]t the direction of the Inspector," the bus was taken out of service and Cabral was taken to "MBTA Headquarters," where he gave "oral and written reports of the incident" and submitted to drug and alcohol testing.  (Docket Entry # 1, pp. 7–8).  The drug test results "showed a presence of 'marijuana metabolites'" in Cabral's urine.  (Docket Entry # 1, p. 10). The complaint states this was the result of Cabral's

unintentional consumption of "a brownie that had marijuana baked into it" the night before. (Docket Entry # 1, p. 10, n.19). On October 25, 2017, the MBTA held a disciplinary hearing, which Cabral attended. (Docket Entry # 1, p. 11). At the hearing and "as a direct result of the failed drug test," the MBTA imposed a "70-day (unpaid) suspension and a recommendation for discharge." (Docket Entry # 1, p. 11).

Cabral "immediately prepared" a grievance and submitted it to the union's secretary, who confirmed that it was "reviewed and submitted" to the MBTA. (Docket Entry # 1, p. 12). The union subsequently informed Cabral that the grievance was "assigned" to union delegate Hogan. (Docket Entry # 1, pp. 1, 12). Cabral spoke with Hogan via telephone sometime in December 2017, at which time Hogan "quickly outlined all of the steps in the grievance procedure," with an emphasis on "the arbitration phase." (Docket Entry # 1, p. 12). After this conversation, Cabral made "numerous attempts" to contact Hogan for more information about "the grievance process," but communication between them was "essentially non-existent." (Docket Entry # 1, p. 13). Hogan provided "no real details" about the grievance process. (Docket Entry # 1, p. 13). Only after Cabral contacted Hogan to "find out the status" of his grievance did Hogan inform Cabral that his grievance "had been denied at each step." (Docket Entry # 1, p. 13). Cabral "was not allowed to

attend any of the hearings, meetings, etc. during the grievance process." (Docket Entry # 1, p. 13)

On March 25, 2018, Cabral received a letter informing him that "the MBTA had discharged him as a Bus Operator." (Docket Entry # 1, p. 14). Two days later, Cabral emailed Hogan "asking him what the next steps were to ensure the request for arbitration was timely and properly made." (Docket Entry # 1, p. 14). Cabral did not receive an immediate response to this email. (Docket Entry # 1, p. 14). Following several unsuccessful attempts over the next three weeks to contact Hogan via email, fax, and telephone, Cabral reached him by telephone on April 17. (Docket Entry # 1, p. 14). During their conversation, Hogan informed Cabral that his grievance was "no longer being given any attention" and that it would "remain that way" until Cabral paid any outstanding union dues he owed. (Docket Entry # 1, p. 14). Hogan also told Cabral that, even if he paid his dues, there was "a 99.9% chance" that his request for arbitration would be denied. (Docket Entry # 1, p. 14).

Dissatisfied with Hogan's response, Cabral made attempts over the next several weeks to contact union president O'Brien and vice president Peggy LaPaglia ("LaPaglia") "for assistance with his Grievance and information on what he had to do to proceed . . . to the arbitration phase." (Docket Entry # 1, p. 15). On April 29, 2018, Cabral also sent a letter to the

8

General Manager of the MBTA explaining his situation and asking the MBTA to review and reconsider its decision to discharge him from employment.  (Docket Entry # 1, p. 15).  Cabral did not receive a response from O'Brien, LaPaglia, or the MBTA "[o]ver the first couple weeks in May 2018."  (Docket Entry # 1, p. 15).

On May 15, 2018, Cabral received from the union's executive board ("the board") a letter informing him that the board "had decided 'not to pursue arbitration of [his] discharge grievance.'"  (Docket Entry # 1, p. 16).  This letter also informed Cabral of his right to appeal the board's decision by requesting a vote by union members "to bring his case to arbitration" at the membership meeting on May 15, 2018.  (Docket Entry # 1, p. 16).  Because Cabral received the board's letter on the day of the membership meeting, he "was not able to prepare for or attend the meeting."  (Docket Entry # 1, p. 16).

<u>DISCUSSION</u>

I.  <u>The Labor Management Relations Act</u>

The complaint characterizes the breach of the CBA claim against the MBTA (Count I) and the duty of fair representation claim against the union (Count II) as a "'hybrid § 301 case'" under the LMRA.  (Docket Entry # 1, pp. 2-3).  As accurately articulated by the MBTA, plaintiff correctly acknowledges that the breach of the CBA claim is ordinarily subject to exhaustion of the grievance process.  (Docket Entry # 31, p. 7) (Docket

Entry # 13, pp. 4-5); see Hayes v. New England Millwork
Distrib., Inc., 602 F.2d 15, 18 (1st Cir. 1979).  Absent an
exception "to the general rule of exhaustion," Hayes, 602 F.3d
at 18, Count I fails to state a plausible claim for breach of
the CBA, as argued by the MBTA.  (Docket Entry # 31, p. 7).  In
light of the union's purportedly wrongful refusal to process the
grievance, the complaint presents "'a hybrid § 301'" case or
claim.  (Docket Entry # 1, pp. 2-3) (quoting Vaca v. Sipes, 386
U.S. 171 (1967)); (Docket Entry # 13, p. 5).

      Section 301 of the LMRA provides that "[s]uits for
violation of contracts between an employer and a labor
organization" may be brought in federal district court.  29
U.S.C. § 185(a).  A hybrid section 301 action is "sort of [a]
double-barreled suit . . . composed of two causes of action—one
against the employer and the other against the union."
Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir.
2003).  In a hybrid section 301 case, the two claims are
"'inextricably interdependent.'"  Balser v. Int'l Union of
Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Local
201, 661 F.3d 109, 118 (1st Cir. 2011).  To prevail against
either the employer or the union, a plaintiff must prevail
against both.  Id.  Defendants argue that the complaint fails to
state a claim under the LMRA because the MBTA is not an employer
subject to the LMRA, and plaintiff consequently is not an

employee who may bring suit under the LMRA.  (Docket Entry # 10, pp. 3-4) (Docket Entry # 31, p. 1).

The LMRA "'incorporates by reference'" and makes applicable to section 301 the definitions of "employer" and "employee" found in the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq., which is "part of the LMRA." Bos. Archdiocese Teachers Ass'n v. Archdiocesan Cent. High Sch., Inc., 383 F. Supp. 2d 269, 275 (D. Mass. 2005) (internal citation omitted). For purposes of the LRMA and the NLRA, the term "'employer'" does not include "any State or political subdivision thereof," and the term "'employee'" does not include "any individual employed . . . by any . . . person who is not an employer as herein defined."  29 U.S.C. § 152(2), (3).

A plaintiff may not bring suit under section 301 against an entity that is not an employer as defined by the LMRA. Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575, 983 F.2d 325, 329 (1st Cir. 1993) (court lacked subject matter jurisdiction over section 301 case brought against a political subdivision of the state); Bos. Archdiocese Teachers Ass'n, 383 F. Supp. 2d at 274-75 (allowing Rule 12(b)(6) dismissal of section 301 claim because LMRA definition of employer excludes church-operated schools).  Similarly, a person who does not meet the statutory definition of "employee" cannot bring suit under section 301.  See Strasburger v. Bd. of Educ., Hardin Cty. Cmty.

Unit Sch. Dist. No. 1, 143 F.3d 351, 359-60 (7th Cir. 1998) (dismissing public school employee's section 301 claim). This includes persons employed by public entities. See Crilly v. Se. Pa. Transp. Auth., 529 F.2d 1355, 1362-63 (3rd Cir. 1976) (Congress did not intend LMRA to cover public employees); Cunningham v. Local 30, Int'l Union of Operating Eng'rs, AFL-CIO, 234 F. Supp. 2d 383, 395 (S.D.N.Y. 2002) ("courts have consistently held that public employees cannot bring claims under NLRA and LMRA provisions").

Plaintiff disputes defendants' assertion that the MBTA is not subject to the LMRA and cites various Massachusetts statutes that exclude the MBTA from the definition of "'public employer'" for purposes of Massachusetts labor relations law. (Docket Entry # 38, p. 11). These statutes, however, do not control in a section 301 analysis. "Federal, rather than state, law governs the determination . . . whether an entity created under state law is a 'political subdivision' of the State and therefore not an 'employer' subject to the [LMRA]." National Labor Relations Board v. The Natural Gas Util. Dist. of Hawkins Cty., Tenn., 402 U.S. 600, 602-03 (1971).

In determining whether an entity is a political subdivision of the state, federal courts show great deference to the National Labor Relations Board's ("NLRB") definition of "political subdivision." Voices for Int'l Bus. and Educ., Inc.

v. National Labor Relations Board, 905 F.3d 770, 773 (5th Cir.
2018).  This definition covers "two situations: when an entity
is '(1) created directly by the state, so as to constitute
departments or administrative arms of the government, or (2)
administered by individuals who are responsible to public
officials or to the general electorate.'"  Id. (quoting National
Labor Relations Board v. The Natural Gas Util. Dist. of Hawkins
Cty., Tenn., 402 U.S. at 604-05); see also Smith v. Reg'l
Transit Auth., 827 F.3d 412, 417 (5th Cir. 2016); Chaparro-Febus
v. Int'l Longshoremen Ass'n, Local 1575, 983 F.2d at 329; Moir
v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 271 (6th
Cir. 1990); Rose v. Long Island R.R. Pension Plan, 828 F.2d 910,
915-16 (2d Cir. 1987); Crilly v. Se. Pa. Transp. Auth., 529 F.2d
at 1358.

     The MBTA is an entity created by state statute as a "body
politic . . . and a political subdivision of the commonwealth."
Mass. Gen. Laws ch. 161A, § 2.  It is governed by the Board of
Directors of the Massachusetts Department of Transportation, the
state department empowered to "direct, operate, administer and
implement the programs of roadway, general aviation, rail and
transit."  Mass. Gen. Laws ch. 6C, § 3(5); Mass. Gen. Laws ch.
161A, § 3.  The members of this board are appointed by the
governor of Massachusetts.  Mass. Gen. Laws ch. 6C, § 2(b).
Therefore, the MBTA is both created directly by the state and is

administered by individuals who are responsible to elected officials, making it a political subdivision of the state under either of the NLRA's definitions.

Although no First Circuit case directly addresses this issue, other federal appeals courts reach the same conclusion when considering transit authorities in other states. For example, the Third Circuit in Crilly undertook a thorough analysis of the legislative intent behind excluding political subdivisions of states from the NLRA/LMRA definition of "employer" and held that the plaintiff could not bring suit under section 301 against the Southeastern Pennsylvania Transportation Authority ("SEPTA"). Crilly v. Se. Pa. Transp. Auth., 529 F.2d at 1358-63. In holding that the SEPTA was a political subdivision of Pennsylvania, the court noted that it was "created by an act of the state legislature as an 'agency and instrumentality' of the Commonwealth to 'exercise . . . public powers.'" Id. at 1358 (internal citation omitted). It further noted that the SEPTA was governed by a board of directors appointed by state officials and had the power to exercise eminent domain. Id. The MBTA shares all of these characteristics with the SEPTA. Mass. Gen. Laws ch. 6C, § 2; Mass. Gen. Laws ch. 161A, §§ 2, 3(o), 7. Moreover, other federal appeals courts similarly conclude that statutorily created transportation authorities are political subdivisions of

14

states under the NLRA/LMRA definition.  See, e.g., Smith v. Reg'l Transit Auth., 827 F.3d at 417 (transit authority created under Louisiana statute a political subdivision of the state); Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d at 271–72 (transit authority created by state and administered by board responsible to elected officials was a political subdivision of Ohio); Rose v. Long Island R.R. Pension Plan, 828 F.2d at 915–16 (Metropolitan Transportation Authority a "political subdivision of the state of New York").  The weight of this authority supports the conclusion that the MBTA is political subdivision of Massachusetts within the meaning of the NLRA/LMRA definition.

Plaintiff cites two federal district court cases to support his assertion that the MBTA is subject to suit under section 301 of the LMRA:  Logie v. Mass. Bay Transp. Auth., Civil Action No. 17-10949-PBS,[4] and Andrews v. Mass. Bay Transit Auth., 872 F. Supp. 2d 108 (D. Mass. 2012) (Docket Entry # 38, p. 9).  In Logie, the court dismissed the section 301 claims on statute of limitations grounds, but stated in a footnote that the LMRA may apply to the MBTA and the union because "the MBTA has not always been considered a state actor for all purposes" and that "[a]t

---

[4]  Plaintiff cites the civil action number of Logie without specifying which of the two published decisions he relies upon. (Docket Entry # 38, p. 9).  Placed in the context of plaintiff's argument, this court assumes plaintiff relies upon Logie v. Mass. Bay Transp. Auth., Civil Action No. 17-10949-PBS, 2018 WL 3721380 (D. Mass. July 31, 2018).

least one court has considered LMRA claims against the MBTA."
Logie v. Mass. Bay Transp. Auth., 2018 WL 3721380, at *5 n.7
(internal citations omitted).  The Logie court's former
statement refers to a Massachusetts state court case in which
the court noted that the MBTA "became" a "'public employer'"
under 2009 amendments to the state tort claims act.  Smith v.
Mass. Bay Transp. Auth., 968 N.E.2d 884, 887 (Mass. 2012)
(internal citation omitted).  The Logie court's latter statement
refers to Andrews, in which the court dismissed a section 301
claim against the MBTA on statute of limitations grounds.
Andrews v. Mass. Bay Transp. Auth., 872 F. Supp. 2d at 117-119;
Logie v. Mass. Bay. Transp. Auth., 2018 WL 3721380, at *5 n.7.

     As neither Logie nor Andrews relied on a determination that
the MBTA was subject to suit under the LMRA, and as
Massachusetts' classification of the MBTA as a private employer
for state law purposes does not determine its status under the
LMRA, see National Labor Relations Board v. The Natural Gas
Util. Dist. of Hawkins Cty., Tenn., 402 U.S. at 602-03 (federal,
as opposed to state, law determines employer status), these
cases do not overcome the weight of authority indicating that
the MBTA, as a subdivision of the state, is exempt from the
LMRA's coverage.  In conclusion, because the MBTA is a political
subdivision of the Commonwealth of Massachusetts, it is not an
"employer" covered by the LMRA.  Consequently, plaintiff is not

an "employee" who may bring suit against either the MBTA or the union under section 301 of the LRMA.  Plaintiff's "hybrid § 301 claim" in counts I and II is therefore subject to dismissal. Any stand-alone breach of the CBA claim against the MBTA also fails for lack of exhaustion.

## II.  The Railway Labor Act

Faced with defendants' opposition to the LMRA claim, plaintiff changes tack and asserts that the duty of fair representation claim against the union arises under the RLA. (Docket Entry # 13, p. 2).  He concedes that the RLA does not provide a cause of action for breach of the CBA against the MBTA, but asserts that the two claims together form a "'hybrid' suit," akin to the section 301 claim, over which a federal court has jurisdiction.  (Docket Entry # 13, p. 3).  Defendants argue that because "the MBTA is not covered by the RLA," plaintiff "cannot proceed under the RLA" and "this suit is . . . subject to dismissal."  (Docket Entry # 21, p. 1) (Docket Entry # 31, p. 10).

"As 'the exclusive bargaining representative of the employees, a union has a statutory duty fairly to represent all of those employees. . ..'"  Emmanuel v. Int'l Bd. of Teamsters, Local Union No. 25, 426 F.3d 416, 419-20 (1st Cir. 2005) (internal citations and brackets omitted).  "This duty is called the 'duty of fair representation,'"  Emmanuel v. Int'l Bd. of

17

Teamsters, Local Union No. 25, 426 F.3d at 420 (internal
citation omitted), and was developed "in a series of cases . . .
under the Railway Labor Act." Vaca v. Sipes, 386 U.S. 171, 177
(1967) (internal citation omitted).

These cases locate the source of the duty of fair
representation in section two of the RLA, which authorizes
"employees" of "carriers" to "organize and bargain collectively
through representatives" and obligates the carriers to confer
with these representatives in deciding disputes between the
"carrier . . . and its . . . employees." 45 U.S.C. § 152; see
Vaca v. Sipes, 386 U.S. at 177 ("exclusive agent's statutory
authority to represent all members . . . includes a statutory
obligation to serve the interests of all members"); Bd. of R.R.
Trainmen v. Howard, 343 U.S. 768, 774 (1952) ("[b]argaining
agents who enjoy the advantages of the Railway Labor Act's
provisions" must "execute their trust" fairly); Steele v.
Louisville & N.R. Co., 323 U.S. 192, 199 (1944).  The duty also
arises from "the policy which [the RLA] has adopted," Tunstall
v. Bd. of Locomotive Firemen and Enginemen, Ocean Lodge No. 76,
323 U.S. 210, 213 (1944), a policy to "avoid any interruption to
commerce or to the operation of any carrier engaged therein," to
provide "the right of employees to join a labor organization,"
and to provide for the settlement of disputes between "carriers"

18

and their "employees."  45 U.S.C. § 151a; see Int'l Ass'n of
Machinists v. S.B. Street, 367 U.S. 740, 760-61 (1961).

Notably, the RLA defines "'carrier'" to include "any
railroad subject to the jurisdiction of the Surface
Transportation Board" and provides that this definition "shall
not include any street, interurban, or suburban electric
railway, unless such railway is operating as a part of a general
steam-railroad system of transportation."  45 U.S.C. § 151.  The
RLA defines "'employee'" as a person working "in the service of
a carrier" and "'representative'" as a person or entity
"designated either by a carrier . . . or by its . . . employees,
to act for it or them."  Id.

Furthermore, the Surface Transportation Board has
jurisdiction over "transportation by rail carrier."  49 U.S.C. §
10501.  Subject to exceptions not relevant here, it does not
have jurisdiction over public transportation provided by "'local
government authorit[ies],'" which include "political
subdivision[s] of a State" and "public corporation[s] . . .
established under the laws of a State."  49 U.S.C. §§ 5302,
10501.  In addition, the relevant definition of "'rail
carrier,'" like the RLA's definition of "carrier," excludes
"street, suburban, or interurban, or suburban electric
railway[s] not operated as part of the general system of rail

transportation."  49 U.S.C. §§ 10102(5), 10501; <u>accord</u> 45 U.S.C.
§ 151.

As discussed in Roman numeral I, the MBTA is an entity
created by state statute as a "body politic and corporate, and a
political subdivision of the commonwealth."  Mass. Gen. Laws ch.
161A, § 2.  As such, it is not subject to the jurisdiction of
the Surface Transportation Board and therefore not a "carrier"
for purposes of the RLA.  Furthermore, the complaint refers only
to the MBTA's bus operations "surrounding the Charlestown
Garage" in the Massachusetts municipalities of Charlestown,
Medford, Malden, and Everett.  (Docket Entry # 1, p. 5).  While
this court takes judicial notice of the fact that the MBTA also
operates rail lines within and between Massachusetts
municipalities, the complaint alleges no facts indicating that
these are a part of a "general steam-railroad system of
transportation" rather than simply an "interurban [] or suburban
electric railway."  45 U.S.C. § 151.  Therefore, plaintiff
alleges no facts showing that that the MBTA is not excluded from
the definition of a rail carrier for purposes of the RLA.

Because the MBTA is excluded from the RLA's definition of
"carrier," plaintiff is not an "employee" under the RLA and the
union is not a "representative."  Therefore, the MBTA and its
employees lie outside Congress' concerns about interruptions to
carrier service and the rights of those employed by carriers,

and section two of the RLA does not authorize or obligate the MBTA, its employees, or the union representing them to do anything. For these reasons, the duty of fair representation arising from the RLA's statutory scheme does not apply to the union, and the complaint's claim that the union breached this duty must fail.[5] Count II against the union is therefore subject to dismissal. As plaintiff concedes that the claim against the MBTA for breach of the CBA could only be brought under the RLA as a "'hybrid' suit" with the claim against the union (Docket

---

[5]  The duty of fair representation that was originally implied by the RLA "was soon extended to unions certified under the N.L.R.A." Vaca v. Sipes, 386 U.S. at 177. Like the duty arising under the RLA, a labor organization's duty of fair representation under the NLRA is "implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998); see also Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 563 (1990) ("duty of fair representation is inferred from unions' exclusive authority under the [NLRA]"); Crentsil v. State Healthcare & Research Emps., Civil Action No. 16-40030-TSH, 2017 WL 5760315, at *6 (D. Mass. Sept. 26, 2017) (union's duty of fair representation implied in its status "[p]ursuant to section 9(a) of the [NLRA]").

To the extent that the complaint claims that the union breached the duty of fair representation under the NLRA as distinct from the duty arising under the RLA, the claim fails for the same reason the claim under the RLA fails. As discussed in Roman numeral I the MBTA, as a political subdivision of Massachusetts, is not an employer covered by the NLRA, and plaintiff therefore is not an employee. Consequently, the union does not have any status or authority as the exclusive representative of any "employee" as defined by the NLRA. See 29 U.S.C. § 159. As with the RLA, because the union enjoys no status or authority under the NLRA, it has no duty implied from it.

Entry # 13, p. 3), the claim against the MBTA under the RLA also fails.

III.  <u>FTA/DOT Regulations</u>

The MBTA seeks dismissal of the FTA/DOT claim on the basis that plaintiff "incorrectly reads the parameters" of the regulations and fails to adequately allege that the MBTA violated them.  (Docket Entry # 31, pp. 2, 11, 12).  It goes further and argues that its drug test of plaintiff, rather than being prohibited by these regulations, was in fact mandated by them.  (Docket Entry # 31, pp. 2, 12).  Plaintiff disagrees and asserts that the MBTA "overstepped its authority" and "improperly enforce[ed]" and administered FTA/DOT regulations when it forced him to undergo a drug test after "erroneously classif[ying] an 'incident' as an 'accident'" and neglected to determine prior to the test whether he "'contributed' to the 'incident.'"[6]  (Docket Entry # 1, pp. 21, 23, n.50).

---

[6]  The complaint claims that the MBTA violated both FTA and DOT regulations.  (Docket Entry # 1, p. 21).  Plaintiff's opposition to the MBTA's motion to dismiss also refers in passing to 49 C.F.R. § 40, the section of the DOT regulations providing procedures for "all parties who conduct drug and alcohol tests required by Department of Transportation (DOT) agency regulations," including agencies other than the FTA.  49 C.F.R. § 40.1(a); (Docket Entry # 38, p. 1).  As noted *infra*, the FTA is an agency of the DOT, and although section 40 of the DOT is distinct from the regulations applicable only to the FTA, plaintiff relies solely on arguments based on language found in the FTA-specific regulations.  (Docket Entry # 1, p. 21, nn.43, 44) (Docket Entry # 38, p. 1, nn. 1, 2).  In addition, plaintiff's opposition to the MBTA's motion to dismiss

The FTA is an agency of the United States Department of Transportation, and the DOT has delegated authority to the FTA to administer regulations pertaining to public transportation.[7] 49 C.F.R. §§ 1.91, 655.4; 49 U.S.C. § 5301.  FTA regulations include those "designed to help prevent accidents, injuries, and fatalities resulting from the misuse of alcohol and use of prohibited drugs by employees who perform safety-sensitive functions."  49 C.F.R. 655.1.[8]  One such regulation, on which plaintiff relies, pertains to "post-accident testing" and states that:

> [a]s soon as practicable following an accident . . . in which a public transportation vehicle is involved, the employer shall drug and alcohol test each covered employee operating the public transportation vehicle at the time of

---

consistently refers to these regulations as "FTA/DOT regulations" without differentiating between them.  (Docket Entry # 38, p. 13-15).  For these reasons, this court will not address "claims" arising under DOT regulations other than the FTA regulations.  See Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 45 (1st Cir. 2011) (courts not required to make determinations on claims that "'are merely insinuated rather than actually articulated'") (internal citation omitted).
[7]  The complaint also alleges that the MBTA violated plaintiff's right to privacy as protected by the Omnibus Transportation Employee Testing Act of 1991 ("OTETA"), the statute under which the FTA testing scheme was promulgated.  (Docket Entry # 1, p. 2, n.5); 49 C.F.R. § 655.2; Prevention of Prohibited Drug Use in Transit Operations, 59 Fed. Reg. 7572, 7572 (Feb. 15, 1994).  Any claim the complaint purports to bring directly under OTETA must fail, as there is no private right of action under OTETA.  Byrne v. Mass. Bay Transp. Auth., 196 F. Supp. 2d 77, 86-87 (D. Mass. 2002).
[8]  The cited FTA regulations apply to recipients of federal funding for public transportation systems.  49 C.F.R. § 655.3.  The parties do not dispute that the MBTA is subject to these regulations.

> the accident unless the employer determines, using the best
> information available at the time of the decision, that the
> covered employee's performance can be completely discounted
> as a contributing factor to the accident.

49 C.F.R. § 655.44(a)(2)(i).  An "accident" includes "an

occurrence associated with the operation of a vehicle" in which

an "individual suffers bodily injury and immediately receives

medical treatment away from the scene of the accident."  49

C.F.R. § 655.4.

Plaintiff interprets the above regulation as limiting the

MBTA's authority to require a post-accident drug test and argues

that the MBTA exceeded its authority because two "specific

criteria" were not met:  (1) the event triggering the drug test

did not meet the FTA regulation's definition of an "accident";

and (2) the MBTA failed to make a determination prior to drug

testing plaintiff as to whether his performance could be

"completely discounted as a contributing factor that led to the

alleged 'accident.'"  (Docket Entry # 1, pp. 21, 23) (Docket

Entry # 38, p. 2).  The meaning of a federal regulation is

"determined in accordance with ordinary principles of statutory

construction."  Wojciechowicz v. United States, 582 F.3d 57, 73

(1st Cir. 2009).  "'[I]f the language of a statute or regulation

has a plain and ordinary meaning, courts need look no further

and should apply the regulation as it is written.'"  Id. at 74

(internal citation omitted).

As to the first criterion, plaintiff misconstrues a condition *sufficient* to trigger a drug test under the regulation as a mandatory *condition* necessary to trigger the drug test. The plain language of the regulation upon which plaintiff relies requires employers covered by the FTA to perform drug and alcohol tests in certain specified circumstances; it does not circumscribe their authority to test or limit the additional circumstances under which they may test.  The regulation states that an employer "shall" drug and alcohol test employees operating public transportation vehicles following "accidents" as defined by the regulation.  49 C.F.R. §§ 655.4, 655.44. Beyond stating that it should not be construed to authorize delaying necessary medical attention in order to perform a drug test, the regulation does not contain language providing any circumstance under which an employer shall not drug test employees.  49 C.F.R. § 655.44(e).

The regulation plaintiff cites is silent on the question of whether employers may test following an occurrence that is not an "accident" or in any other circumstances not described by the regulation.  The cited regulation is in fact part of a regulatory scheme that mandates testing in a number of circumstances, including pre-employment testing, random testing, "reasonable suspicion" testing, and testing when an employee returns to duty after a positive drug or alcohol test result.

25

49 C.F.R. §§ 40.23(d), 40.305, 655.41–655.47.  The FTA also
explicitly acknowledges that employers may implement a testing
program that goes beyond the regulatory requirements.  See
https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/Impleme
ntationGuidelines_Oct2009.pdf (last visited May 29, 2019), Fed.
Transit Admin., U.S. Dept. of Transp., Implementation Guidelines
for Drug and Alcohol Regulations in Mass Transit 2-14, (2009);
see https://babel.hathitrust.org/cgi/pt?id=ien.35556036078848;
view=1up;seq=1 (last visited May 29, 2019), Fed. Transit Admin.,
U.S. Dept. of Transp., Best Practices Manual: FTA Drug and
Alcohol Testing Program 2-4 (2002).

   The purpose of the FTA's drug-testing, regulatory scheme is
to prevent injuries and accidents resulting from drug use by
public transportation employees, not to protect employees from
invasive testing.  49 C.F.R. § 655.1.  The main objects of the
regulatory scheme are ensuring that employers prevent
impermissible drug and alcohol use by employees in safety-
sensitive positions, detect when these employees have
impermissibly used drugs or alcohol, and exclude them from
safety-sensitive positions if they have done so.  See, e.g., 49
C.F.R. §§ 655.11, 655.12, 655.21, 655.31, 655.32.  Therefore,
plaintiff's construction of a regulation that is part of this
scheme as a limitation on the MBTA's authority to conduct drug
testing does not comport with the plain language of the

26

regulation or the regulations' purposes.  For this reason,
plaintiff's claim that the MBTA "overstepped its authority" by
requiring him to submit to a drug test following an "incident"
that was not an "accident" must fail.  (Docket Entry # 1, p.
21).

Moreover, the facts as stated in the complaint support the
MBTA's assertion that what plaintiff terms an "incident" in fact
met the regulatory definition of an "accident"—an occurrence
that results in "an individual suffer[ing] bodily injury and . .
. receiv[ing] medical treatment away from the scene of the
accident."  49 C.F.R. § 655.4.  The complaint acknowledges that
plaintiff applied the brakes while operating an MBTA bus and
that a passenger "lost her balance and fell on her
arm/wrist/hands."  (Docket Entry # 1, p. 6).  The complaint also
concedes that the passenger claimed to be injured and "insisted
on taking [an] ambulance to the hospital to receive further
medical attention."  (Docket Entry # 1-2, p. 6).

As the FTA regulations do not define bodily injury, "the
ordinary meaning of the . . . language" applies, and "'[c]ourts
are free to use standard dictionary definitions to assist in
determining the ordinary meaning of statutory language.'"
Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012)
(internal citation omitted); United States v. Lachman, 387 F.3d
42, 51 (1st Cir. 2004) (dictionaries "are a fundamental tool in

ascertaining the plain meaning of terms used in statutes and regulations"). Although plaintiff argues that the passenger was not truly injured (Docket Entry # 1, p. 7, n.11), the facts as alleged show that the MBTA properly could have characterized the fall as "causing physical damage to [the passenger's] body." Black's Law Dictionary (10th ed. 2014) (defining "bodily injury").

In regard to the portion of the definition of accident requiring that an individual "receive[] medical treatment away from the scene," 49 C.F.R. § 655.4, plaintiff argues that because emergency personnel advised the passenger that she needed no further medical treatment, what occurred was not an "accident." (Docket Entry # 1, p. 22). The plain language of the regulation does not depict or limit the medical treatment to *necessary* medical treatment. It also does not impose an assessment by personnel that medical treatment away from a scene is required. Simply stated, whether such treatment was deemed necessary and by whom is immaterial. The fact that the passenger received medical treatment suffices to meet this aspect of the definition, and the fact that the passenger did so against the advice of emergency personnel does not place the occurrence outside that definition.

The claim that the FTA regulation did not permit the MBTA to drug test plaintiff without first determining whether he

28

"'contributed' to the 'incident'" fails for the same reason—it reads into the regulation a limitation on the MBTA's authority that the regulation does not impose.  (Docket Entry # 1, p. 23). The complaint highlights the portion of the regulation that states an employer must drug test an employee "operating the public transportation vehicle at the time of the accident *unless the employer determines, using the best information available at the time of the decision, that the covered employee's performance can be completely discounted as a contributing factor to the accident*."  (Docket Entry # 1, p. 21, n.44) (bolding omitted).  Plaintiff interprets the italicized language to "require a determination to be made before federally-mandated post-accident testing is allowed."  (Docket Entry # 45, p. 5).

Plaintiff further argues that the MBTA admits to making a later determination that the "'incident'" was "'non-preventable,'" which, according to plaintiff, shows that the MBTA could and should have made the same determination before administering the drug test.  (Docket Entry # 38, p. 13).  The MBTA argues that the regulation's language does not impose an obligation to make a pre-test determination of whether an "employee's performance can be completely discounted as a contributing factor to [an] accident."  (Docket Entry # 31, p. 12, n.12).

29

The MBTA is correct.  The plain language of the cited regulation provides an exception to the obligation to test, not a pre-requisite to triggering that obligation.  49 C.F.R. § 655.44.  The regulation contains no language stating that an employer *must* determine whether an employee's conduct contributed to an accident, either at the time of the accident, prior to testing, or at any other time.  Id.  The regulation states only that if an employer does make such a determination, it may serve as a justifiable basis for that employer to opt against administering a drug test.  49 C.F.R. § 655.44(a)(2)(i), (d).

The fact that this language is meant only to provide a limited exception to an employer's obligation to test employees, not impose a pre-requisite to testing, is further evinced by other provisions within the same regulation.  In the same subsection imposing the requirement to test each employee operating a public transportation vehicle at the time of an accident, the regulation states, "The employer shall also drug and alcohol test any other covered employee whose performance could have contributed to the accident, as determined by the employer using the best information available at the time of the decision."  49 C.F.R. § 655.44(a)(2)(i).

In contrast to the provision pertaining to employees operating accident-involved vehicles, this provision indicates

that the obligation to test additional employees is triggered by an employer's determination that those employees' performance could have contributed to the accident.  The fact that the drafters of this regulation deliberately choose different language to describe an employer's obligation to test the operator of an accident-involved vehicle and its obligation to test other, non-operator employees indicates an intent not to require an employer to make the same pre-test assessment of culpability in regard to an operator as it must make before testing other employees.  See Russello v. United States, 464 U.S. 16, 23 (1983) ("'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (internal citation omitted); accord United States v. Guidant Corp., 718 F.3d 28, 35 (1st Cir. 2013).

Furthermore, the regulation requires that an employer "document[] in detail" a decision *not* to test when it determines "that [an] employee's performance could not have contributed to the accident."  49 C.F.R. § 655.44(d) (emphasis added).  The regulation does not require an employer to similarly justify or document a decision to administer a post-accident drug test. This demonstrates, as the Supreme Court has recognized, that these regulations "embody . . . policies against drug use by

employees in safety-sensitive transportation positions and in favor of drug testing," not an intent to limit an employer's ability to administer drug and alcohol tests.  E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 58 (2000); see 49 C.F.R. § 655.1.

Finally, plaintiff's allegation that the MBTA "admitted that the 'incident' was 'non-preventable'" fails on a factual and temporary basis.  The section of the MBTA's memorandum to which plaintiff refers states, "[W]hile the employer may have ultimately determined that the accident was non-preventable[,] thereby discounting any fault on behalf of the plaintiff, this determination was not made until well after the accident and thus was not available at the time of decision to send him for testing."  (Docket Entry # 31, p. 12, n.12) (emphasis added).  In the same footnote, the MBTA, referring again to a determination that the accident was "non-preventable," states that "such a determination is neither required, nor was it made in connection with this matter."  (Docket Entry # 31, p. 12, n.12).

This language does not amount to an admission by the MBTA that it determined, either at the time of the accident or afterwards, that the "accident" was "non-preventable."  Rather, it states only the MBTA's argument that, even if it had made such a decision after the fact, this would not have affected the

32

decision to test plaintiff at the time of the accident. Plaintiff's statement that "[t]he MBTA's mention of this in a footnote in its Supporting Memorandum was the first time [he] became aware of the 'non-preventable' determination" (Docket Entry # 38, p. 13, n.8) further supports the conclusion that no such determination was made and that the MBTA merely intended to point out that, even in a hypothetical situation where it later determined that plaintiff was not at fault, that later determination would not have impacted the validity of the decision to test at the time of the accident.  Count III is therefore subject to dismissal.

IV.  <u>Section 1983—Fourth Amendment Right to Privacy</u>

The MBTA seeks dismissal of the section 1983 claim on the ground that its drug test of plaintiff was "not an unreasonable search and seizure as a matter of law" and that the test was "required by federal law."  (Docket Entry # 31, p. 2). Plaintiff argues that the MBTA violated his Fourth Amendment right to privacy "when it forced him to submit to drug and alcohol testing, without having any authority to do so." (Docket Entry # 1, p. 20).  Specifically, the complaint refers to the FTA/DOT regulations discussed in Roman numeral III and states that "[i]t is not acceptable, or constitutional, for an employer to force . . . testing on an employee unless an

'accident' (as defined) has truly occurred." (Docket Entry # 1, p. 20, n.40).

As plaintiff acknowledges, the Fourth Amendment "'does not proscribe all searches and seizures, but only those that are unreasonable.'" Murphy v. City of Newton, Civil Action No. 15-12964, 2017 WL 6329614, at *4 (D. Mass. Dec. 11, 2017) (quoting Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 619 (1989)); (Docket Entry # 1, p. 20, n.40). "'The reasonableness of random drug testing in employment situations is to be evaluated by balancing the governmental interests at stake against the individual's legitimate expectations of privacy.'" Dwan v. Mass. Bay Trans. Auth., Civil Action No. 95-12430-GAO, 1998 WL 151242, at *1 (D. Mass. Mar. 20, 1998).

As Congress made clear with OTETA and the regulations promulgated under it, there is an "unmistakable" governmental interest in protecting mass transit users against the dangers of drug and alcohol use by mass transit employees in "safety-sensitive" positions. Dwan v. Mass. Bay Trans. Auth., 1998 WL 151242, at *1–2; (Docket Entry # 1, p. 20, n.40). The complaint acknowledges this interest, as well as the fact that, as the operator of a public transportation vehicle, plaintiff had "less rights to privacy . . . given the public-safety aspect of [his] position." (Docket Entry # 1, p. 20, n.40).

34

The government's interest in protecting public safety against the dangers of drug use by certain government employees "'presents "special needs" . . . that may justify departures from the usual warrant and probable-cause requirements'" of the Fourth Amendment.  Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. at 620 (internal citation omitted).  This is a "context-specific inquiry, examining closely the competing private and public interests," Chandler v. Miller, 520 U.S. 305, 314 (1997), but "[g]enerally, testing of personnel in safety-sensitive positions has been upheld against Fourth Amendment challenges." Dwan v. Bay Transp. Auth., 1998 WL 151242, at *2.

Acceptable testing includes testing in the absence of a triggering event such as an accident.  Keaveney v. Town of Brookline, 937 F. Supp. 975, 986 (D. Mass. 1996).  In fact, the MBTA may go so far as to "subject . . . employees performing safety-sensitive functions, to random, suspicionless drug testing."  Byrne v. Mass. Bay Transp. Auth., 196 F. Supp. 2d 77, 81 (D. Mass. 2002).  There is also value to unpredictable testing as a deterrent against impermissible drug and alcohol use.  Chandler v. Miller, 520 U.S. at 315; Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. at 629-30.  In addition, courts recognize that, due to the time-sensitive nature of drug testing, taking the time to make determinations of fault following an accident may "seriously impede an employer's ability to discern the cause

35

of the accident." Chandler v. Miller, 520 U.S. at 315 (citing Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. at 631).

A drug test need not be authorized by or conducted pursuant to a federal regulation or an employer's stated policy to survive Fourth Amendment scrutiny; the question of whether a test meets the Fourth Amendment's "reasonableness standard" is a distinct inquiry. Murphy v. City of Newton, 2017 WL 6329614, at *7. In fact, even a drug test that violates an employer's own policy or agreement with an employee or union is not necessarily unconstitutional. See Murphy v. City of Newton, 2017 WL 6329614, at *6-7. The court in Murphy held that an ad hoc decision to drug test a firefighter following an altercation with a coworker did not violate the Fourth Amendment, irrespective of whether the test was permitted under the collective bargaining agreement between the city and the union representing the firefighter. Murphy v. City of Newton, 2017 WL 6329614, at *6-7 (a finding that drug test violated CBA procedures "would not change the outcome" of Fourth Amendment analysis).

The complaint links the Fourth Amendment violation of privacy claim to the FTA/DOT regulations and argues that because the MBTA "invoke[d] [the] authority" of the FTA/DOT regulations to perform the drug test, a test plaintiff believes the regulations did not authorize, this test violated the Fourth

36

Amendment.  (Docket Entry # 1, p. 20, n.40).  Plaintiff's
opposition to the MBTA's motion to dismiss elaborates on the
basis of the claim, stating that, "[i]n all respects," the
constitutional claim "is based on violations of the FTA/DOT
regulations . . . committed by the MBTA when it classified an
'incident' as an 'accident.'"  (Docket Entry # 38, p. 12).  It
also states that, because the MBTA failed to determine, prior to
drug testing him, whether his "performance could be completely
discounted as a contributing factor," "the test was an
unreasonable search pursuant to the Fourth Amendment."  (Docket
Entry # 38, p. 12).

Plaintiff improperly conflates the Fourth Amendment inquiry
with the question of what testing the FTA/DOT regulations permit
or prohibit.  To satisfy the Constitution, the MBTA's drug test
need only meet the Fourth Amendment's context-specific
reasonableness standard.  See generally Murphy v. City of
Newton, 2017 WL 6329614, at *4.  In this case, plaintiff
occupied a safety-sensitive position, for which the Fourth
Amendment permits drug testing in a broad range of
circumstances, including at random.  While operating a mass
transit vehicle, plaintiff applied the brakes to avoid a
swerving vehicle, and a passenger "fell on her arm/wrist/hands."
(Docket Entry # 1, p. 6).  The passenger was subsequently taken
to the hospital, and the bus taken out of operation.  The MBTA

had an interest in timely gathering information about the causes
of this occurrence, as well as an ongoing interest in detecting
and deterring drug use by its employees in safety-sensitive
positions.  Balancing the relevant interests, the MBTA's
interests undeniably outweigh plaintiff's lowered privacy
expectation.  See Murphy v. City of Newton, 2017 WL 6329614, at
*4 (recognizing that "safety concerns associated with certain
types of employment may lower employees' reasonable expectations
of privacy").  Therefore, for purposes of the Fourth Amendment,
the MBTA did not act unreasonably when it tested plaintiff
following this occurrence, regardless of whether it technically
met the regulatory definition of an accident.

Plaintiff relies entirely on the argument that the MBTA
violated his Fourth Amendment right to privacy by testing him
following an "incident" that was not an "accident" without first
assessing his culpability.  In light of the foregoing, the
complaint therefore fails to allege facts sufficient to show
that the MBTA acted unreasonably in requiring the drug test and
the Fourth Amendment right to privacy claim (Count IV) fails.

V.   State Law Claims

Where, as here, a district court has dismissed all the
claims over which it has original jurisdiction, it may decline
to exercise supplemental jurisdiction over state law claims.  28
U.S.C. § 1367(c)(3).  In fact, "when all federal claims have

been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.'" Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) (internal citations omitted).  Generally, "'unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims.'" González-De-Blasini v. Family Dept., 377 F.3d 81, 89 (1st Cir. 2004) (internal citation omitted); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) (federal courts usually decline to exercise supplemental jurisdiction when all federal claims eliminated before trial).

To the extent that the complaint raises a claim of breach of the collective bargaining agreement or a duty of fair representation claim under state law, the interests of fairness, judicial economy, convenience, and comity do not require this court to retain jurisdiction over these claims.  The statute of limitations on such claim is suspended during their pendency in this court and will not begin to run again until 30 days after the dismissal of this case.  28 U.S.C. § 1367(d); Artis v. Dist. of Columbia, 138 S. Ct. 594, 596 (2018).  In addition, this case is in its early stages, and any state law claims may involve interpretation of state statutes and case law pertaining to the

39

MBTA's relationship with its own employees.  <u>See</u> Mass. Gen. Laws ch. 150E; <u>Johnston v. Sch. Comm. of Watertown</u>, 533 N.E.2d 1310, 1311 (Mass. 1989); <u>Blauvelt v. AFSCME Council 93, Local 1703</u>, 910 N.E.2d 956, 963 (Mass. App. Ct. 2009); <u>Switzer v. Labor Relations Comm'n</u>, 633 N.E.2d 1056, 1057 (Mass. App. Ct. 1994).  For these reasons, it is inappropriate to exercise supplemental jurisdiction over any remaining state law claims and this court therefore recommends their dismissal without prejudice.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[9] that defendants' motions to dismiss (Docket Entry ## 9, 30) be **ALLOWED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[9]  Any objection to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Fed. R. Civ. P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.